Mitchell Edward RUPE, Petitioner,

v.

Tana WOOD, Superintendent of Washington State Penitentiary, and Kenneth O. Eikenberry, The Attorney General of the State of Washington.

No. C91–1635Z.

United States District Court,
W.D. Washington,
Northern Division, at Seattle.

Sept. 19, 1994.

1318

David Allen, Richard A. Hansen, Todd Maybrown, Allen & Hansen, Seattle, WA, Kathryn Lund Ross, Jones, Ross, Besman & Connolly, P.S., Lynnwood, WA, for petitioner.

Mitchell Edward Rupe, pro se.

John Scott Blonien, John M. Jones, Paul Douglas Weisser, John Joseph Samson, Atty. Gen's. Office, Corrections Div., Olympia, WA, Daniel G. Steele, U.S. Dept. of Justice, Environment and Nat. Resources Div., Washington, DC, for respondents.

## ORDER GRANTING WRIT OF HABEAS CORPUS

ZILLY, District Judge.

THIS MATTER comes before the Court on petitioner Mitchell Edward Rupe's petition for writ of habeas corpus. By Order entered October 14, 1993 (docket no. 145), the Court granted the State's motion to dismiss Claims 5.4, 5.5, 5.6, 5.7, 5.8, 5.9, 5.10, 5.11, 5.12 and 5.15. The Court deferred ruling on Claims 5.1, S.5.1 and 5.2 (ineffective assistance of counsel) and S.5.23 (unconstitutionality of hanging) pending an evidentiary hearing on those claims. The Court also deferred ruling on Claim 5.3 (trial court error in excluding polygraph evidence) pending further consideration. The respondents subsequently filed motions for summary judgment (docket nos. 112, 150, 168) on Rupe's remaining claims. The Court held oral argument on these motions on April 1, 1994. An evidentiary hearing on Claims 5.1, S.5.1, 5.2

and S.5.23 was held during the week of July 11, 1994. By Order dated September 15, 1994, the Court granted the State's motion to dismiss Claims 5.16 through 5.21 and S.5.21.

This Order addresses the respondents' motion for summary judgment as to Claims 5.1, S.5.1, and 5.2 (ineffective assistance of counsel), 5.3 (trial court error in excluding polygraph evidence), 5.13, 5.14, and S.5.14 (prosecutorial and trial court error in admitting gun collection evidence), and 5.22 and S.5.22 (death penalty statute violates due process and equal protection rights).

The Court GRANTS respondents' motion for summary judgment as to petitioner's Claims 5.1, S.5.1, 5.2, 5.13, 5.14 and S.5.14, and 5.22 and S.5.22. The Court DENIES respondents' motion for summary judgment as to petitioner's Claim 5.3, and GRANTS petitioner's petition for writ of habeas corpus as to that claim. By separate Order issued concurrently, the Court GRANTS petitioner's petition for writ of habeas corpus as to Claim S.5.23 alleging that petitioner's hanging in accordance with the Washington Field Instruction would constitute cruel and unusual punishment because of his particular circumstances, 863 F.Supp. 1307.

### SUMMARY OF RELIEF GRANTED

Pursuant to this Order and a separate Order issued this date relating to petitioner's hanging claim (S.5.23), the Court grants petitioner Rupe's petition for writ of habeas corpus on two claims.

*Claim 5.3.* The Court concludes that Rupe's Fifth, Eighth and Fourteenth Amendment rights were violated by the refusal of the trial court to admit the results of Monte Yovetich's polygraph examination at the second penalty trial. Under well established federal law, a defendant in a capital case has a constitutional right to present *all* relevant mitigating evidence relating to the circumstances of the offense. Yovetich was a key witness in the case against Rupe. Yovetich testified that on the day of the murders, Rupe told Yovetich that he had robbed the

bank, hid the money and gun in Yovetich's garage, and asked Yovetich to dispose of the money and gun. Yovetich admitted that he tried to dispose of the gun and the money but denied that he had participated in the robbery and murders. In contrast, Rupe testified that he saw Yovetich at the bank on the morning the bank tellers were murdered. Rupe also denied his own involvement in the crimes. Shortly after the murders, the Olympia Police Department administered a polygraph examination to Yovetich. The officer who administered the polygraph examination concluded that Yovetich's answers to questions concerning his role in the robbery and murders were deceptive.[1] Both polygraph expert witnesses who testified at the recent hearing also concluded that Yovetich's answers showed deception. Yovetich's failure of the polygraph examination constituted relevant mitigating evidence, which Petitioner was entitled to present to the jury during the penalty phase of his trial. The trial court's failure to permit this testimony to be heard by the jury constituted a violation of Rupe's federal constitutional rights for which habeas relief must be granted.

■ *Claim S.5.23.* By separate Order, the Court also grants relief on Rupe's hanging claim. The Court finds that there is a significant risk that Rupe's hanging will result in decapitation because of his peculiar physical characteristics. A hanging that is likely to result in decapitation constitutes cruel and unusual punishment under the Eighth Amendment of the federal Constitution, and is contrary to "public perception of standards of decency." *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

The Court dismisses the remainder of Rupe's claims.

### ANALYSIS OF CLAIMS

### I. CLAIMS 5.1, S.5.1 and 5.2—INEFFECTIVE ASSISTANCE OF COUNSEL

#### A. Rupe's Claims

Clifford F. Cordes III was appointed to represent Mr. Rupe in September 1981 by

---

1. That officer later testified that although the test results conclusively showed deception, he had doubts as to the validity of the test results. The polygraph experts who testified at the evidentiary

hearing disagreed as to whether the conditions under which the test was taken affected the validity of the results.

the Thurston County Superior Court. Mr. Cordes served as Rupe's counsel until October 18, 1988, when the Supreme Court of Washington approved the withdrawal of Mr. Cordes from representation of Rupe and the substitution of Allen & Hansen, P.S. 24 REC 11739–40. This withdrawal and substitution of counsel followed the United States Supreme Court's denial of Rupe's petition for writ of certiorari in *Rupe v. Washington,* 486 U.S. 1061, 108 S.Ct. 2834, 100 L.Ed.2d 934 (1988).

Mr. Cordes represented Rupe during his first trial and appeal, and at his second penalty trial and on direct appeal to the Washington Supreme Court following that proceeding. Rupe contends that he was denied effective assistance of counsel both at the second trial and on appeal. Petitioner claims Mr. Cordes' performance at the second penalty trial was deficient in that he:

(1) failed to object to a jury instruction requiring that jurors not permit sympathy to influence their verdict (claims 5.1.3—5.1.4, 5.1.28—5.1.31);

(2) opened the door to and then failed to refute the State's cross-examination of petitioner regarding possible commutation of a sentence of life imprisonment without the possibility of parole (5.1.5—5.1.9);

(3) failed to object to the prosecutor's improper closing arguments (5.1.43—5.1.45);

(4) failed to submit a jury instruction regarding the presumption of leniency (5.1.26—5.1.27);

(5) failed to object to testimony of irrelevant gun ownership (5.1.32—5.1.42);

(6) failed to submit jury instructions properly defining "relevant factors" (5.1.46—5.1.49);

(7) failed to consult with and obtain an expert witness to counter the police polygrapher's testimony that Monte Yovetich's polygraph was unreliable (S.5.1.1—S.5.1.15);

(8) failed to object to or take other corrective action when the prosecutor failed to call petitioner's fellow death row inmate, Patrick Jeffries, to testify regarding alleged confessions made to him by petitioner after the prosecutor had cross-examined

petitioner regarding such statements (S.5.1.16—S.5.1.19); and

(9) failed to recognize that RCW 10.95.090 prohibited retrial of the penalty phase following invalidation of petitioner's death sentence and objecting to the retrial on that basis (S.5.1.23—S.5.1.24).

Rupe contends that counsel's appellate representation was also deficient in that counsel failed to identify on appeal the issue of the introduction of evidence concerning Rupe's ownership of weapons unrelated to the crime. This is particularly egregious, Rupe argues, because it was the introduction of irrelevant gun evidence at his first penalty trial that served as the basis for the Washington Supreme Court's reversal of his first death sentence.

### B. *Constitutional Standards*

■ In order to prevail on a claim of ineffective assistance of counsel, the petitioner must satisfy the two-prong test established in *Strickland v. Washington,* 466 U.S. 668, 678, 687, 104 S.Ct. 2052, 2059–60, 2064, 80 L.Ed.2d 674 (1984). First, Rupe must show that his attorney's performance was deficient. Second, he must establish that he was prejudiced by counsel's deficient performance.

■ To meet the first prong of the test, the petitioner must show that counsel made errors so serious that his performance fell below an objective standard of reasonableness under prevailing professional norms. *Strickland,* 466 U.S. at 687–88, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. Judicial scrutiny of counsel's performance, however, "must be highly deferential." *Id.,* 466 U.S. at 689, 104 S.Ct. at 206, 80 L.Ed.2d at 694.

A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.... [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged ac-

tion "might be considered sound trial strategy."

*Id.* (citation omitted).

To meet the prejudice prong of the *Strickland* test, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.,* 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* When a defendant challenges a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.,* 466 U.S. at 695, 104 S.Ct. at 2069, 80 L.Ed.2d at 698. In making this determination, the reviewing court "must consider the totality of the evidence before the judge or jury." *Id.*

### C. *Adequacy of Performance at Second Penalty Trial*

Although petitioner has identified numerous instances of deficient performance by his trial counsel at the second penalty phase, petitioner has focused attention on two particular aspects of counsel's representation: (1) counsel's failure to object to the introduction of irrelevant gun evidence, and (2) failure to consult with and obtain an expert witness to counter the polygraph examiner's testimony that Monte Yovetich's polygraph was unreliable. Rupe's other ineffective assistance claims involve counsel's acts and omissions respecting jury instructions, prosecutorial misconduct and evidentiary issues.

#### 1. *Gun Evidence*

At petitioner's first penalty trial the trial court allowed the State to introduce evidence concerning Rupe's gun collection, including the admission of several weapons: (1) a CAR 15 semiautomatic rifle, (2) a 12–gauge shotgun with one shortened barrel, (3) a .22 caliber rifle, and (4) a pistol with interchangeable barrels. *See State v. Rupe,* 101 Wash.2d 664, 703, 683 P.2d 571 (1984) ("*Rupe I* "). In addition to the weapons themselves, the State presented the testimony of several firearms experts who testified that the weapons in Rupe's collection, though legal, were not suitable for hunting or sport. One expert testified that the CAR 15 was "designed as an anti-personnel rifle." *Id.* at 703, 683 P.2d 571. The prosecutor used this evidence in his closing argument to emphasize that Rupe was an extremely dangerous person.

Rupe challenged the admission of this evidence in his first state appeal, arguing that the evidence was irrelevant, prejudicial and violative of his due process rights. The Supreme Court of Washington agreed with all three contentions and reversed Rupe's death sentence on this basis. The supreme court held that Rupe was entitled under the Washington Constitution to possess weapons, and the State was prohibited from drawing adverse inferences from Rupe's exercise of that constitutional right. *Rupe I,* 101 Wash.2d at 706–07, 683 P.2d 571. Applying *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), the supreme court concluded that the State's impermissible use of this evidence, specifically its attempt to draw adverse inferences from the exercise of a constitutional right, required reversal of Rupe's death sentence.

The supreme court also held that the gun evidence was both irrelevant and highly prejudicial. The gun evidence was irrelevant because it had no connection to the crime. The court described the prejudicial nature of the evidence as follows:

> Personal reactions to the ownership of guns vary greatly. Many individuals view guns with great abhorrence and fear. Still others may consider certain weapons as acceptable but others as "dangerous." A third type may react solely to the fact that someone who has committed a crime has such weapons. Any or all of these individuals might believe that defendant was a dangerous individual and therefore deserved to die, just because he owned guns. This was, in fact, the crux of the prosecutor's argument to the jury for defendant's death.

*Rupe I,* 101 Wash.2d at 708, 683 P.2d 571. "Because the challenged evidence was violative of defendant's due process rights, irrele-

vant and thus inadmissible," the supreme court vacated Rupe's death sentence and remanded for a new sentencing proceeding.

At Rupe's second penalty trial, the State called on F.B.I. Special Agent Peter Shepp to testify about his investigation of petitioner.[2] After testifying about petitioner's cooperation with law enforcement officials and his attempts to give them information about the robbery, Agent Shepp testified about weapons owned by petitioner:

Q: Did you ask Mr. Rupe if he owned any firearms?

A: I did.

Q: What did he tell you?

A: He told me he had a .357 caliber revolver. However, he said at that time he had loaned it to a Monte Yovetich, who resided on Holman Street in Shelton, Washington, but was now somewhere in Okanagan [sic], and that is why he loaned the weapon to him, because he wanted to take it hunting. He also had a 12–guage [sic] Remmington shotgun, a Colt semi-automatic .22 caliber or carbine, a savage over and under 30–30 caliber 20 guage [sic], which he said was in a gun shop in Bremerton, Washington, Puget Sound Firearms, and a .22 caliber lever action Ithaca rifle.

A: Did you ask Mr. Rupe about his checkbook at all?

18 REC 8848. The portion of Agent Shepp's testimony concerning the murder weapon, the .357 caliber revolver, was proper,[3] but the remainder of his testimony concerning Rupe's gun ownership improperly introduced inadmissible evidence.

Rupe's trial counsel failed to object to the admission of the irrelevant gun testimony, nor did he move for a mistrial or request a curative instruction. At the evidentiary hearing, counsel testified that he did not recall Agent Shepp's testimony concerning the gun collection, nor could he recall a reason for not objecting to it. He also testified, however, that he was alert throughout the proceedings, was sensitized to the gun issue as a result of the supreme court decision, and would probably have objected to the testimony at trial had he believed it was prejudicial. There is no evidence indicating that counsel's failure to take any action with respect to the irrelevant gun evidence was a tactical decision. In an affidavit dated August 25, 1992, Rupe's trial counsel stated, "I cannot think of any strategic reason for not objecting to such evidence or for failing to bring a motion for a mistrial based on the introduction of the gun collection evidence." 28 REC 13402.

In contrast to Rupe's counsel, the prosecutor, Gary Tabor, had no trouble recalling Agent Shepp's testimony concerning the gun testimony. Mr. Tabor testified that he did not expect Agent Shepp to testify as to Rupe's lawfully-owned weapons, and was "surprised" that Shepp mentioned them during his testimony. Tabor also recalls feeling uncomfortable at the time Shepp testified as to those weapons. Upon hearing the testimony, Tabor "shifted [his] weight" and hoped it would resolve itself quickly.

Plaintiff's expert, Robert Leen, testified that defense counsel's failure to take any action with respect to the introduction of the gun testimony was below reasonable professional standards for attorneys handling capital cases. He described counsel's failure to act as "inexplicable," particularly in view of "the message of the supreme court that such evidence was improper, highly prejudicial, and grounds for reversal." Leen Affid. at 9. Leen also testified that had Rupe's trial

---

2. Agent Shepp testified at Rupe's first trial about his conversations with Mr. Rupe on the day of the murders (September 17, 1981) and during the course of the investigation. Shepp's testimony covered Rupe's statements concerning his visits to the bank on September 16 and 17, the information Rupe offered to the police concerning customers and vehicles Rupe saw at the bank on the day of the murders, the clothing Rupe claimed he was wearing that day, Rupe's explanation as to why his checkbook was found in the bank on the day of the murders, the results of a search of Rupe's locker and Ford Bronco, and Rupe's ownership of a .357 Colt Trooper Mark III, for which he had a valid permit. 6 REC 2931–2968. Agent Shepp did not mention any weapons other than the .357 caliber revolver. 6 REC 2945.

3. The State's introduction of the .357 Colt revolver identified as the murder weapon is not challenged by Petitioner.

counsel moved for a mistrial based on the inadmissible gun evidence, there was a substantial likelihood that the judge would have granted the motion. *Id.*

The Court concludes that trial counsel's failure to take any action with respect to the admission of the irrelevant gun evidence deprived the petitioner of effective assistance of counsel. The admission of evidence concerning Rupe's gun collection in the first penalty trial was the basis for the Washington Supreme Court's reversal of petitioner's original death sentence. Although the evidence of gun ownership in the first trial was more expansive than that in the second trial, and the prosecutor's misuse of the evidence far more egregious, there was no question following *Rupe I* that the admission of *any* evidence concerning Rupe's gun collection would be improper.

Counsel for Rupe had several options available to minimize the damage from Agent Shepp's testimony. He could have moved to strike the irrelevant gun testimony and offered a curative instruction. Alternatively, he could have moved for a mistrial. Instead, he did nothing. Given the supreme court's clear directive concerning this type of evidence and the seriousness of the proceedings at hand, it was unreasonable for Rupe's counsel not to take any action concerning the irrelevant gun testimony.

By finding that trial counsel's performance was defective in this regard, the Court is not implying that counsel was generally unskilled or lacked commitment to Mr. Rupe's cause. To the contrary, the record establishes that Mr. Cordes was a devoted and zealous advocate who worked very hard at the penalty trial to convince the jurors that Rupe's life should be spared. Counsel presented an extraordinary number of witnesses who testified as to Rupe's good character, nine-year military record and various accomplishments. Mr. Cordes obviously spent many hours preparing for trial, and for the most part shouldered this burden alone. Even devoted and skillful advocates, however, commit errors, and where those errors effectively deprive the defendant of his right to counsel, the court must find counsel's representation to be ineffective.

### 2. *Yovetich Polygraph*

Monte Yovetich was the State's key witness in the case against Rupe and testified that he had no involvement in the bank robbery or murders. Yovetich testified that on the day of the murders, Rupe told Yovetich that he had robbed the bank, hid the money and gun in Yovetich's garage, and asked Yovetich to "go east of the mountains for a few days, spend some of the money, and get rid of the gun." 19 REC 9301–02. Yovetich admitted that he tried to dispose of the gun and the money. Although Yovetich denied taking any of the money, more than $2000 of the stolen currency was never recovered. The police did recover the gun, however. Yovetich told the police that he threw the gun off the Hartstene Island Bridge, and the gun was subsequently recovered from waters near that bridge. For his part in the crime, Yovetich pled guilty to rendering criminal assistance and possession of stolen property. 19 REC 9318. Yovetich served eight months in jail. 19 REC 9410.

At Rupe's original guilt and penalty trials, defense counsel moved to admit the results of a polygraph examination of Monte Yovetich for purposes of cross-examination. That polygraph examination conclusively showed deception on the part of Yovetich and cast doubt on the veracity of Yovetich's testimony and the level of his involvement in the robbery and murders.

#### a. *Circumstances of Polygraph*

Monte Yovetich was arrested at approximately 12:01 a.m. on September 23, 1981, in connection with the investigation of the robbery and two murders at the Tumwater State Bank. The Olympia Police Department conducted the polygraph examination of Yovetich on September 24, 1981, at 5:45 p.m. Yovetich had been interrogated by Olympia police detectives twice prior to the commencement of the polygraph examination, the latter interrogation commencing at 11:40 a.m. on September 23, 1994, the day before the polygraph examination. Officer Maynard Midthun was the polygraph examiner.

The polygraph examination of Mr. Yovetich was a control-question exam commonly

known as a modified general questions test (MGQT). During an MGQT exam, the examiner asks a set of nine to twelve questions. Three or four of those questions concern the issues under investigation. The entire set of nine to twelve questions, including the relevant questions, is asked at least three times. During the questioning the polygraph instrument continuously measures and permanently records the subject's physiological reactions, which include changes in skin conductance (palmar sweating), blood pressure and respiratory activity. After the test is completed, the examiner numerically evaluates the polygraph charts to determine whether the pattern of physiological reactions indicates truthfulness or deception. The examiner scores each chart and then combines the scores on the three charts to obtain a total numerical score. A total numerical score of − 3 or lower for an individual relevant question conclusively indicates deception as to that question. A total numerical score of + 3 or higher for a question conclusively indicates truthfulness as to that question. A total score of less than three, either plus or minus, is considered inconclusive.

Polygraph examiners evaluate their examinations to determine whether they are "conclusive" and "valid." A conclusive test is a test that the polygraph examiner can conclude, based on scoring, indicates truthfulness or deception. A valid test is one in which the results of the test are accurate. A test is valid if the examiner is confident that the reactions on the polygraph chart were caused by the subject's deception rather than by other factors, such as fatigue, alcohol or drug use, and illness, which may produce a false reaction. Thus, a polygraph test may be conclusive but invalid.

During Yovetich's polygraph exam, Officer Midthun asked the following relevant questions:

(1) Did you participate in the robbery of that bank last Thursday?

(2) Did you lie about throwing the pistol off the Hartstene Island Bridge?

(3) Do you know where the rest of that stolen money is now?

(4) Did you lie about being in Mason County when that bank was robbed?

Yovetich answered "no" to each of these questions. Based on his numerical scoring of the examination, Officer Midthun determined that the exam conclusively indicated deception as to each of the four questions. Pl.Ex. 9.

### b. *Exclusion of Polygraph*

At Rupe's first trial, Mr. Cordes moved to admit the results of Yovetich's polygraph examination for cross-examination purposes. The trial court, after hearing testimony from Yovetich and Officer Midthun, refused admission of the Yovetich polygraph results, concluding that the polygraph results were unreliable. The trial court's exclusion of the evidence was based in significant part on Officer Midthun's testimony that the exam's validity was in doubt. Officer Midthun testified that Mr. Yovetich's nervousness, lack of sleep, hostility towards the Olympia police, and poor rapport between Officer Midthun and his subject rendered the polygraph examination of questionable validity.

Rupe challenged the exclusion of the polygraph evidence on appeal. In *Rupe I*, the Washington Supreme Court upheld the exclusion of the evidence at the guilt phase, finding that it "simply does not reach the minimal threshold of reliability necessary to its admission in a criminal proceeding." *Rupe I*, 101 Wash.2d at 690, 683 P.2d 571. The court also noted that the results of the polygraph were undercut by subsequent events. For example, the polygraph charts indicated that Yovetich was lying when he asked if he threw the gun off the Hartstene Island Bridge, yet the gun was subsequently located precisely where Yovetich stated he had thrown it.

■ With respect to the exclusion of the evidence at the penalty phase, the supreme court, citing *State v. Bartholomew*, 101 Wash.2d 631, 683 P.2d 1079 (1984),[4] concluded:

4. The *Bartholomew* court held that polygraph examination results are admissible by the defense in capital sentencing proceedings, subject to certain restrictions. *Bartholomew*, 101 Wash.2d at 646, 683 P.2d 1079. *Bartholomew* sets two conditions for the admission of polygraph examina-

Although we recognize that death sentencing proceedings involve interests that require more relaxed evidentiary rules when considering evidence in defendant's favor, we cannot go so far as to permit clearly unreliable evidence to be introduced. We hold, therefore, that polygraph examinations will not be admitted in those limited cases where their trustworthiness is seriously in doubt.

*Rupe I,* 101 Wash.2d at 691, 683 P.2d 571.

*Bartholomew* was decided after Rupe's first penalty trial but before his retrial. Thus, the trial court in the first penalty trial did not evaluate the admissibility of the evidence under the *Bartholomew* standard. On appeal, the supreme court, referring to *Bartholomew,* upheld the exclusion of the polygraph results, finding that the Yovetich polygraph was "clearly unreliable." *Rupe I,* 101 Wash.2d at 691, 683 P.2d 571. Because the supreme court had upheld the exclusion of the polygraph under *Bartholomew,* the trial court refused to admit it during the second sentencing trial. 14 REC 6497.

Although Mr. Cordes sought to admit other evidence concerning the possibility that Yovetich committed the crime, he did not move specifically to admit the polygraph results at the second penalty trial. In response to an inquiry by the trial court as to the admissibility of the Yovetich polygraph testimony, Mr. Cordes stated:

> ... I could see under circumstances where it would be admissible if we had, for example, a new hearing on the reliability of the polygraph in this particular case, and went beyond what we did in the first hearing there, and the Court then were able to determine, well, I believe, in this case, it was reliable because of these new facts.

As it stands now, I think we would be precluded simply from the *Rupe* decision. 14 REC 6479.

### c. Counsel's Performance

Rupe alleges that Mr. Cordes' failure to consult with a polygraph expert regarding the reliability of the Yovetich examination, and his failure to reopen the issue of reliability of the Yovetich polygraph results at the second penalty trial, fell below reasonable professional standards. Rupe offers the testimony of Paul Minor, president of American International Corporation and an expert in polygraph examinations, to show that highly qualified experts were available to challenge Midthun's conclusions concerning the validity of the Yovetich polygraph results. Mr. Minor testified that the circumstances of Monte Yovetich's polygraph were typical of polygraph examinations of persons in custodial settings, and that the factors cited by Midthun as casting doubt on the validity of the test's results would not in fact "invalidate the examination, render the charts inconclusive, or effect [sic] the reliability of the examination results." Minor Affid. at 6. According to Minor, the polygraph testing and results of the examination administered to Yovetich fell within the normal range of possible error for polygraph examinations generally, which is 2 to 3%. Based on his independent review of the Yovetich polygraph charts, Minor concluded that the test conclusively showed deception as to the first three relevant questions, but the results of the last relevant question were inconclusive.[5] Minor concluded, "[t]he polygraph testing of Monte Yovetich produced conclusive results, the results showed that Mr. Yovetich was not truthful in answering 'no' to each relevant question, the testing was valid, [and] the results were reliable." Minor Affid. at 4. Mr. Minor was a highly qualified and credible witness, and the Court accords his testimony great weight.

---

tion results at the sentencing phase of capital cases. First, the trial judge may refuse to accept such evidence if he is not convinced that the examiner is qualified or that the test was conducted under proper conditions. Second, if the graphs and examiner's opinion are offered in evidence, the opposing party shall have the right to cross-examine the examiner respecting: (a) his qualifications and training; (b) the conditions under which the test was administered; (c) the limitations of and possibilities for error in the technique of polygraph interrogation; and (4) at the discretion of the trial judge, any other matter deemed pertinent to the inquiry. *Id.*

5. Minor's numerical scoring of the test resulted in scores of $-4$, $-5$, $-3$ and $-2$, in order of sequence, for the four relevant questions.

The State's expert on polygraph examinations, Dr. David Raskin, Professor of Psychology at the University of Utah, also concluded that the Yovetich polygraph test conclusively showed deception as to the first three relevant questions but the results of the fourth question were inconclusive.[6] Dr. Raskin disagreed, however, with Mr. Minor's conclusion that the test results were valid. Dr. Raskin testified that "[a] number of factors relating to the physical and mental condition of [Yovetich] at the time of the test," such as recent alcohol and drug use, lack of sleep, prior interrogations and nervousness, "contributed to a substantially increased risk of error in the polygraph test." Raskin Affid. at 16. Raskin also cited technical deficiencies in the examination. In Dr. Raskin's opinion, the test questions were asked too close in time and some of the control and relevant questions were poorly worded. Moreover, Yovetich displayed ectopic (irregular) cardiac activity on the polygraph charts, which "made it impossible to evaluate his psychological reactions to some of the questions." *Id.* at 12.

■ It is not this Court's task to determine whether the Yovetich polygraph results were valid. Rather, the Court must determine whether, in light of all the circumstances, trial counsel's failure to consult an expert and present expert testimony on the reliability of the Yovetich polygraph results at the second penalty trial was outside the wide range of professionally competent assistance. The Court concludes that it was not.

Petitioner has established by credible expert testimony that reasonable, qualified polygraph experts could differ on the validity of the Yovetich polygraph results. Thus, it is clear that trial counsel *could* have obtained an expert to testify that the Yovetich test results were reliable. The critical issue, however, is whether it was professionally un-

reasonable for Mr. Cordes not to obtain such an expert.

It was certainly reasonable for Mr. Cordes not to consult with an expert during the first trial.[7] At the first trial, Cordes made an offer of proof in support of his motion to admit the polygraph results, which included the testimony of Monte Yovetich and Officer Midthun. As Cordes expected, Midthun testified that he administered the test, the test was conclusive and the test showed deception as to each of the relevant questions. Upon questioning of the prosecutor, however, Midthun testified that certain factors may have affected the validity of the test. Midthun's repudiation of the validity of Yovetich's polygraph examination took Cordes by surprise. As he stated in his affidavit, "[n]othing in the discovery I had received concerning the polygraph suggested that Midthun had any doubts regarding the validity of the test of Yovetich." 28 REC 13410. Cordes further stated that the State had not informed Cordes that Yovetich had failed a polygraph exam until immediately before trial. Given the time constraints under which Cordes was working, and the fact that Cordes reasonably expected Midthun to testify that his examination of Yovetich was conclusive and valid, it was reasonable for Cordes not to consult with an expert prior to making his offer of proof.[8]

■ It was also within the wide range of professionally competent representation for Mr. Cordes not to consult with an expert and reopen the issue of the polygraph's reliability at the second penalty trial. At his first trial the trial judge held a full and fair hearing on the issue of the polygraph's admissibility, the result of which was the exclusion of the evidence from the guilt and penalty phases. That ruling was affirmed on appeal by the Washington Supreme Court, and the trial judge at the second penalty trial indicated

6. Dr. Raskin's scores for the four relevant questions were $-4$, $-6$, $-3$ and $0$, respectively.

7. Petitioner argues generally that Mr. Cordes should have retained a polygraph expert to testify as to the validity of the Yovetich test results. It is not clear, however, when petitioner believes it became necessary to hire such an expert. As a result, the Court has considered Mr. Cordes'

professional responsibilities in this regard at both the first and second trials.

8. The Court notes also that Cordes properly identified the exclusion of the polygraph as an issue on appeal and argued effectively, though ultimately unsuccessfully, that the polygraph should have been admitted.

that he would follow that holding. In the wake of an unfavorable supreme court decision addressing the precise issue, it was reasonable for Mr. Cordes not to seek to reopen the issue of admissibility of the polygraph. Mr. Cordes had limited resources and time to prepare for the second penalty trial. He had to weigh the relative benefits and risks of devoting substantial energy and resources to seeking the admission of evidence that the Washington Supreme Court had described as "clearly unreliable" and previously ruled was properly excluded. It was within the wide range of professional competence for Mr. Cordes to assume the trial judge would not admit evidence relating to the polygraph examination in light of the strong language in *Rupe I* on this very issue.

In conclusion, the Court finds that, in light of all the circumstances, trial counsel's failure to consult with an expert and seek to reopen the issue of reliability of the Yovetich polygraph test was within the wide range of professionally competent assistance.

### 3. *Other Alleged Errors*

The Court concludes that the other acts or omissions of Mr. Cordes cited by petitioner were the result of reasonable professional judgment and fell within the wide range of reasonably competent assistance.

### a. *Jury Instructions*

■ Mr. Cordes's failure to object to a "no sympathy" jury instruction was professionally reasonable under the circumstances. Rupe's counsel was concerned about the jurors' potential sympathy for the victims, who had been brutally slain, and sought to minimize the risk that the jurors would be influenced by such sympathy.

■ It was also within the wide range of professional competence for counsel not to propose a "presumption of leniency" instruction. Counsel reasonably believed that the presumption of leniency was implicit in the trial court's other instructions, particularly Instruction Nos. 7 and 8. Petitioner's Ex. 3. Moreover, petitioner's own expert, Robert Leen, testified that counsel's failure to offer a "presumption of leniency" instruction did not fall below a reasonable standard of practice. Leen Affid. at 23–24.

■ The Court also finds that counsel's failure to submit jury instructions limiting the definition of "relevant factors" was professionally reasonable. Petitioner has made no showing that failure to submit such instructions fell below reasonable standards of competence.

### b. *Opening the Door to Cross–Examination of Petitioner Concerning Possible Commutation*

■ During his direct examination of Mr. Rupe, Rupe's counsel asked: "Mitch, at best, you will be looking at Walla Walla for the rest of your life." Rupe responded, "Life without parole." On cross-examination the prosecutor asked Rupe several questions concerning the possibility that his sentence would be commuted. The trial judge ruled that defense counsel had opened the door to cross-examination regarding commutation by his question that "at best" Rupe would be at Walla Walla for the rest of his life.

The Court concludes that trial counsel's questioning of Mr. Rupe, while in hindsight unwise, did not fall below professional standards of competence. By questioning Mr. Rupe about the statutory alternative to the death sentence, life without parole, counsel was reasonably trying to show the jury that a life sentence without the possibility of parole constituted serious punishment. Petitioner's expert, Robert Leen, conceded that this is an acceptable strategy for defense attorneys generally. Mr. Leen takes issue, however, with the unartful wording of Mr. Cordes' question, maintaining that Cordes took an inappropriate risk by phrasing the question as he did. It is not clear, however, that such a risk was evident at the time Mr. Cordes asked the question. Mr. Leen conceded that, although the trial judge ultimately ruled in favor of allowing cross-examination concerning commutation, "it [was] arguable whether Mr. Cordes' question should have been held to 'open the door' to commutation questions, particularly in light of Mr. Rupe's accurate response." Leen Affid. at 20. Similarly, at the evidentiary hearing, Mr. Leen admitted that Mr. Cordes' question to Mr. Rupe did not "necessarily" open the door to cross-

examination concerning commutation. Rather, the prosecutor was skillful in arguing that such a door had been opened. Viewing Mr. Cordes' conduct from his perspective at the time he asked the question, the Court concludes that counsel's actions fell within the wide range of reasonable professional assistance.

### c. Failure to Object to Prosecutor's Closing Argument

■ Rupe contends that the prosecutor seriously misstated the law to the jury during closing argument, and Rupe's trial counsel rendered ineffective assistance by failing to object to the prosecutor's misstatements.[9] Rupe argues that the prosecutor's misstatements of law, which were left uncorrected, had the effect of shifting the burden of proof to petitioner. Again, the Court concludes that, viewing counsel's conduct from counsel's perspective at the time he failed to object, counsel's conduct fell within the wide range of reasonable professional assistance.

Mr. Cordes testified that he usually does not object during the prosecutor's closing argument unless the prosecutor's breach is serious. Petitioner's expert, Mr. Leen, essentially agreed that many defense counsel refrain from making objections during closing arguments unless necessary to do so. Mr. Cordes further testified that he did not object to the prosecutor's arguments in Mr. Rupe's case because he did not believe that the arguments had the effect of shifting the burden of proof to his client.

In the illuminating glow of hindsight, the prosecutor's statements can be made to appear menacing. At the time of trial, however-er, it was far from clear that the prosecutor was so distorting the law that the jury would not properly apply the law as set forth in the instructions. Under the circumstances, there is no basis for finding that counsel's performance was deficient.

### d. Failure to Take Corrective Action in Response to Improper Cross–Examination Concerning Statements to Patrick Jeffries

■ At his second penalty trial Mr. Rupe testified that he did not commit the robbery or murders. During cross-examination, the prosecutor asked Mr. Rupe whether he had made certain incriminating statements to a fellow death row inmate, Patrick Jeffries. Rupe denied making any such statements. Although the prosecutor had subpoenaed Jeffries, the State never called him as a witness.

Rupe's trial counsel did not object to the cross-examination of his client concerning the Jeffries statements. Mr. Cordes also did not move for a mistrial or to strike the testimony once it became apparent that the State did not intend to call Jeffries as a witness to prove the statements. Finally, Cordes did not try to have Jeffries called as a witness.[10]

The Court concludes that counsel's failure to take action with respect to the Jeffries testimony was within the wide range of reasonable professional assistance. Cordes failed to object to the cross-examination at the time it occurred because he reasonably believed that the State intended to call Jeffries as a witness. Cordes testified that he failed to take curative action once he realized that the State did not intend to call Jeffries

---

9. Rupe has identified two misstatements of the law by the prosecutor. First, after listing the eight statutory mitigation factors, the prosecutor cited Rupe's failure to produce evidence: "We didn't hear much testimony why his marriage failed. We didn't hear from his ex-wife, didn't hear from his relationship with the woman in Germany, didn't hear about childhood sweethearts he might have had." This statement suggests, Rupe argues, that Rupe had the burden of proving that leniency was merited. Second, the prosecutor argued:

What are the mitigating circumstances is one question, but, secondly, are they relevant and, thirdly, are they sufficient? Because that is what the question says. Relevant mitigating circumstances that are sufficient.

10. Jeffries told a state investigator on January 4, 1985 that Rupe admitted to Jeffries that he killed the bank tellers. See Transcript of Jeffries Statement to Detective Baker, Respondent's Ex. A–4. Jeffries later recanted his story and wrote a letter to Rupe claiming that the investigator "illegally entrap[ped]" him. Jeffries also denied that Rupe had ever admitted to committing the murders. Petitioner's Ex. 6c. Cordes received a copy of this letter. Because Jeffries, a convicted murderer, had recanted his "story" and because Rupe had flatly denied making any incriminating statements to Jeffries, the Court concludes that nothing would have been gained by either side by calling Jeffries as a witness.

because he did not believe the Jeffries testimony was damaging to Rupe. Cordes also testified that he did not call Jeffries as a witness because he did not consider him to be a credible witness. Thus, Rupe's claim as it relates to the Jeffries matter has no merit.

The Court notes that even if counsel's failure to take curative action with respect to the Jeffries statements fell below a reasonable standard of professional competence, such action did not result in prejudice to Mr. Rupe. Viewing the record as a whole, there is no reasonable probability that, absent counsel's failure to take curative action in response to the Jeffries statements, the outcome of the second penalty trial would have been different.

**e.** *Failure to Recognize that RCW 10.95.090 Prohibited Retrial*

██ Petitioner has made no showing that trial counsel's failure to argue that RCW 10.95.090 prohibited retrial of the penalty phase constituted ineffective assistance of counsel. Petitioner's own expert, Mr. Leen, testified that trial counsel's failure to make such an argument did not fall below reasonable standards of practice. Leen Affid. at 18.

**D.** *Prejudice Resulting from Counsel's Error at Second Penalty Trial*

██ The Court has concluded that trial counsel's failure to take any action with respect to the admission of irrelevant gun testimony fell below reasonable standards of competence. In order to grant *habeas corpus* relief on the basis of ineffective assistance of counsel, however, the Court must determine that "there is a reasonable probability that, absent the errors, the sentencer … would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2069, 80 L.Ed.2d at 698. The Court, having reviewed the entire record of the second penalty trial, concludes that there is not a reasonable probability that, absent this error, the jury would have concluded that there were sufficient mitigating circumstances to merit leniency.

The objectionable firearms testimony took up a few moments, at most, of a ten-day proceeding. The jury in petitioner's second penalty-phase trial had before it evidence that supplied a motive for the crime, several confessions by Mr. Rupe, and evidence of Rupe's ownership of the murder weapon, which was properly admitted. Even without Agent Shepp's testimony that Mr. Rupe possessed several firearms, the record is full of references to Rupe's fascination with the military and survival techniques, his possession and use of guns for target practice, and his possession of a concealed weapon's permit. Such references were supplied by petitioner's attorney, mitigation witnesses, and petitioner himself, in addition to the State. *See, e.g.,* 19 REC 1933, 9135–36, 9677, 9714–15, 9891–92; 20 REC 9899–9900, 10045, 10054. Under all the circumstances, there is no reasonable probability that Agent Shepp's limited testimony concerning Rupe's gun ownership so shifted the balance of aggravating and mitigating factors in the mind of any juror that the verdict would have be different without it.

The Court would reach this same conclusion even if it had found that the other errors cited by petitioner constituted ineffective assistance of counsel. Viewing the record as a whole, there is no basis for finding prejudice.[11]

**E.** *Ineffective Assistance of Counsel on Appeal*

██ Claims of ineffective assistance of appellate counsel are also reviewed under the *Strickland* standard. *Miller v. Keeney,* 882 F.2d 1428, 1433 (9th Cir.1989); *United States v. Birtle,* 792 F.2d 846, 847 (9th Cir.1986). The petitioner must show that appellate counsel's performance fell below an objective standard of reasonableness, and that there is a reasonable probability that, but for counsel's unprofessional errors, the petitioner would have prevailed on appeal. *Miller,* 882 F.2d at 1434.

---

**11.** The Court notes that petitioner's own expert, Robert Leen, acknowledged that, with the exception of trial counsel's failure to object to the admission of irrelevant gun testimony, none of the errors cited by petitioner, standing alone, prejudiced the petitioner.

■ Mr. Cordes did not raise as an issue on appeal the introduction of evidence of Mr. Rupe's ownership of guns unrelated to the crime. Counsel testified that he had no recollection of specifically reviewing Agent Shepp's testimony concerning the guns in preparation for the appeal, or of consciously rejecting the issue as unappealable. Thus, the failure to raise the gun issue on appeal was not a strategic decision.

Because the Washington Supreme Court had previously reversed Mr. Rupe's death sentence based on the admission of irrelevant gun evidence, counsel's failure to raise the gun issue on appeal fell below an objective standard of reasonableness for defense attorneys in capital cases. Petitioner's expert on capital appeals, James Lobsenz, testified that "[a] claim that has been successful in winning a reversal in the very same case is the strongest possible claim ... in an appeal of a criminal conviction or sentence." Lobsenz Affid. at 4. He added that "no issue identified and raised by Mr. Cordes had as much merit as the admission of gun ownership evidence already identified as inadmissible and prejudicial by the [Washington] Supreme Court." Id. The Court agrees with Mr. Lobsenz's conclusion that under the circumstances no reasonable defense attorney in a capital case would fail to raise this issue on appeal.

■ The Court also concludes, however, that Rupe was not prejudiced by his counsel's failure to raise the gun issue on appeal because there is no reasonable probability that Rupe would have prevailed on this issue had it been raised. In *Rupe I*, the Washington Supreme Court reversed Rupe's death sentence because the jury was permitted to draw adverse inferences from Rupe's exercise of a constitutional right. *Rupe I*, 101 Wash.2d at 706, 683 P.2d 571. The supreme court explained:

> Here, in arguing that defendant's exercise of that constitutional right meant that he deserved the death penalty, the State attempted to draw adverse inferences from defendant's mere possession of these weapons. Our [state] constitution, and the due process analysis contained in *Zant*, prohibits use of this evidence.

*Id.* at 707, 683 P.2d 571. The Washington Supreme Court's ruling was also based on the defendant's right to bear arms under the Washington Constitution, art. 1, § 24. The supreme court reasoned that Rupe was "entitled under our [Washington] constitution to possess weapons, without incurring the risk that the State would subsequently use the mere fact of possession against him in a criminal trial unrelated to their use." *Id.* at 707, 683 P.2d 571. In granting Rupe relief, the court rejected the State's argument that Rupe suffered no prejudice from the admission of the gun evidence. The court concluded that certain individuals "might believe that defendant was a dangerous individual and therefore deserved to die, just because he owned guns." *Id.* at 708, 683 P.2d 571.

Despite the supreme court's strong language in *Rupe I* concerning the prejudicial impact of irrelevant gun evidence, there is no reasonable likelihood that the supreme court would have found that Rupe's due process rights were violated or that he suffered prejudice from the admission of the limited gun testimony in the second penalty trial. There is a sharp contrast between the gun evidence admitted in the first trial, and the prosecutor's use of that evidence in that trial, and the nature and use of the limited gun testimony in the second penalty trial.

In the first penalty trial, the State specifically moved to admit evidence of Rupe's gun collection for the purpose of showing that Rupe was an extremely dangerous person. The trial court admitted into evidence several of the weapons themselves, including: (1) a CAR semiautomatic rifle, (2) a 12–gauge shotgun with one shortened barrel, (3) a .22 caliber rifle, and (4) a pistol with interchangeable barrels. The prosecutor also presented the testimony of firearms experts who said that, though the weapons were legal, they were not suitable for hunting or sport. One expert added that the CAR 15 semiautomatic rifle was "designed as an anti-personnel rifle." *See Rupe I*, 101 Wash.2d at 703, 683 P.2d 571. The prosecutor used this evidence against Rupe by arguing, among other things, that Rupe was an extremely dangerous man because the CAR 15 was "an assault weapon to gun groups of people down

in combat situations." *Id.* at 704, 683 P.2d 571. The Washington Supreme Court noted that the "crux of the prosecutor's argument to the jury for defendant's death" was Rupe's ownership of guns. *Id.* at 708, 683 P.2d 571.

The gun evidence in the second penalty trial, in contrast, was limited to the very brief testimony of Agent Shepp and the testimony concerning Rupe's interest in target practice and military survival techniques which was introduced by Rupe's witnesses *in mitigation.* The prosecutor did not expand upon Agent Shepp's limited gun testimony or mention the gun testimony at any time during closing argument. Furthermore, the prosecutor did not seek to admit the weapons themselves or invite the jury to draw adverse inferences from Rupe's ownership of the guns. In short, the State did not attempt to use the gun evidence against Rupe in any way. As a result, there is not a reasonable probability that the Washington Supreme Court would find that the admission of Agent Shepp's limited gun testimony violated Rupe's federal or state constitutional rights.

Assuming, however, that the Washington Supreme Court would have found that the admission of Agent Shepp's gun testimony violated Rupe's federal or state constitutional rights, there is no reasonable probability that the court would have further found that Rupe suffered any prejudice from the admission of the evidence. Agent Shepp's testimony concerning Rupe's gun ownership was

extremely brief and factual in nature, and the prosecutor did not expand upon or use the testimony. Moreover, other evidence of Rupe's gun ownership was before the jury, and most of that evidence was introduced by Rupe himself or his mitigation witnesses in the course of describing Rupe's hobbies and interests. Under these circumstances, there is no reasonable probability that the supreme court, viewing the record as a whole, would have found that Agent Shepp's testimony had any impact on the jury's verdict.

### F. Conclusion

Petitioner has failed to establish that he is entitled to relief on his ineffective assistance of counsel claims. Accordingly, the Court denies Rupe's habeas petition as to Claims 5.1, S.5.1 and 5.2.

### II. CLAIM 5.3—EXCLUSION OF YOVE-TICH POLYGRAPH EVIDENCE

Rupe contends that his Fifth, Eighth and Fourteenth Amendment rights were violated by the refusal of the trial court to admit the results of Monte Yovetich's polygraph examination at the second penalty trial.[12] Yovetich's polygraph examination conclusively indicated deception as to relevant questions concerning Yovetich's involvement in the crime, including the question, "Did you participate in the robbery of that bank last Thursday?".[13] Rupe argues that because the

---

12. Rupe also claims that the trial court violated his Sixth, Eighth and Fourteenth Amendment rights to present a defense by excluding the Yovetich polygraph results from the *guilt* phase of his first trial. Rupe concedes, however, that the exclusion of the polygraph evidence from the guilt phase of the trial was proper under Ninth Circuit authority. *Bashor v. Risley,* 730 F.2d 1228 (9th Cir.), *cert. denied,* 469 U.S. 838, 105 S.Ct. 137, 83 L.Ed.2d 77 (1984). The Court concludes this claim has no merit.

The Ninth Circuit recently held in *Bartholomew v. Wood,* 34 F.3d 870 (9th Cir.1994), that a prosecutor's failure to disclose prior to the guilt phase of defendant's capital trial that a key witness for the State had taken and failed a polygraph examination entitled the defendant to a new trial. *Bartholomew* provides no ground for relief here. The prosecutor properly disclosed to Rupe's counsel prior to the guilt phase the fact that Yovetich had taken, and failed, a polygraph test.

13. Monte Yovetich was the key witness in the State's case. His testimony linked the money taken from the bank and the gun used in the crimes to Mitchell Rupe. As the Washington Supreme Court stated, "many of the facts are consistent with two theories—either that defendant committed the crimes or that Monte Yovetich did." *Rupe I,* 101 Wash.2d at 689, 683 P.2d 571.

During Yovetich's polygraph exam, Officer Midthun asked the following relevant questions:
(1) Did you participate in the robbery of that bank last Thursday?
(2) Did you lie about throwing the pistol off the Hartstene Island Bridge?
(3) Do you know where the rest of that stolen money is now?
(4) Did you lie about being in Mason County when that bank was robbed?
Yovetich answered "no" to each of these questions. Based on his numerical scoring of the examination, Officer Midthun determined that

polygraph results cast doubt on Yovetich's claims that he was not involved in the robbery or murders, the evidence was relevant to Rupe's relative culpability in the crime. As a result, Rupe maintains, the Yovetich polygraph examination results constituted relevant mitigating evidence related to the circumstances of the offense, which under *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and its progeny, could not be excluded from the penalty phase of Rupe's trial.

### A. *Admissibility of Polygraph Examinations under Washington Law*

The general rule in Washington is that polygraph examinations are inadmissible absent stipulation. *Rupe I,* 101 Wash.2d at 690, 683 P.2d 571. In 1984, however, the Washington Supreme Court, in *Bartholomew,* 101 Wash.2d at 646, 683 P.2d 1079, ruled that polygraph examination results are admissible in capital sentencing proceedings when offered by the defense as evidence of mitigation, subject to certain restrictions. The *Bartholomew* court established two requirements for the admission of polygraph examination results at the sentencing phase of capital cases. First, the trial judge may refuse to accept such evidence if he or she is not convinced that the polygraph examiner is qualified or that the test was conducted under proper conditions. Second, if the graphs and examiner's opinion are offered in evidence, the opposing party shall have the right to cross-examine the examiner respecting: (a) his qualifications and training; (b) the conditions under which the test was administered; (c) the limitations of and possibilities for error in the technique of polygraph interrogation; and (d) at the discretion of the trial judge, any other matter deemed pertinent to the inquiry. *Id.*

### B. *State Court Rulings*

At Rupe's first trial, the trial court, after hearing testimony from Yovetich and Officer Midthun (the polygraph examiner), refused admission of the Yovetich polygraph results at both the guilt and penalty phases, finding that the polygraph results failed to meet

the exam conclusively indicated deception as to

standards of reliability under state law. *See* 8 REC 3855–3862 (ruling of trial court). Because Rupe's first penalty trial preceded the supreme court's decision in *Bartholomew,* the trial judge's ruling was not based on the application of the *Bartholomew* standard but rather on pre-*Bartholomew* Washington case authority concerning the admissibility of polygraph evidence generally. On appeal, Rupe challenged the exclusion of the polygraph evidence from both phases of his trial.

The Washington Supreme Court, which had decided *Bartholomew* only two weeks earlier, upheld the exclusion of the evidence at the guilt phase, finding that it "simply does not reach the minimal threshold of reliability necessary to its admission in a criminal proceeding." *Rupe I,* 101 Wash.2d at 690, 683 P.2d 571. The court stated:

> In addition to the questionable reliability of polygraph examinations, the present polygraph examination has other trustworthiness problems. The polygraphist concluded, during defendant's offer of proof, that he doubted the test's validity. He cited Monte Yovetich's lack of sleep, hostility to the police and nervousness as factors which possibly affected the test results.

*Id.* With respect to the exclusion of the evidence at the penalty phase, the supreme court, citing *Bartholomew,* concluded:

> Although we recognize that death sentence proceedings involve interests that require more relaxed evidentiary rules when considering evidence in defendant's favor, we cannot go so far as to permit clearly unreliable evidence to be introduced. We hold, therefore, that polygraph examinations will not be admitted in those limited cases where their trustworthiness is seriously in doubt.

*Rupe I,* 101 Wash.2d at 691, 683 P.2d 571.

Because the Washington Supreme Court had upheld the exclusion of the Yovetich polygraph examination at Rupe's first penalty trial, defense counsel did not move to admit the polygraph results at the second penalty trial. In response to an inquiry by the trial court as to the admissibility of the

each of the four questions. Pl.Ex. 9.

Yovetich polygraph examination at the second penalty trial, defense counsel stated:

> ... I could see under circumstances where it would be admissible if we had, for example, a new hearing on the reliability of the polygraph in this particular case, and went beyond what we did in the first hearing there, and the Court then were able to determine, well, I believe, in this case, it was reliable because of these new facts.

> As it stands now, I think we would be precluded simply from the *Rupe* decision.

14 REC 6479. The trial court agreed that the supreme court's ruling in *Rupe I* precluded admission of the Yovetich polygraph results at the second penalty trial. 14 REC 6497.

### C. *Analysis*

#### 1. *Predicate Issue*

■ Because Rupe's trial counsel failed to offer the polygraph evidence at Rupe's second penalty trial, the Court *sua sponte* raises the issue of whether Rupe may assert a due process claim based on the failure of the trial court to admit evidence that he did not offer. The Court concludes that under these unique and limited circumstances, Rupe's due process claim is properly before this Court. Rupe offered the Yovetich polygraph results at the first trial and challenged the trial court's exclusion of the evidence on appeal. At the second penalty trial, Rupe was effectively prohibited from offering the Yovetich polygraph results because of the Washington Supreme Court's ruling in *Rupe I* that the polygraph evidence was properly excluded. There is no question that Rupe would have offered the evidence at the second penalty trial had the supreme court reached a different result concerning the polygraph evidence. The barrier to the jury's consideration of this evidence was not therefore established by Mr. Rupe, but rather by the Washington Supreme Court's ruling. As the United States Supreme Court has explained, the source of the barrier to the admission of relevant mitigating evidence is immaterial:

> Under our decisions, it is not relevant whether the barrier to the sentencer's consideration of all mitigating evidence is in-

terposed by statute, by the sentencing court, or by an evidentiary ruling.... Whatever the cause, ... the conclusion would necessarily be the same: "Because the [sentencer's] failure to consider all of the mitigating evidence risks erroneous imposition of the death sentence, in plain violation of Lockett, it is our duty to remand this case for resentencing."

*Mills v. Maryland,* 486 U.S. 367, 375, 108 S.Ct. 1860, 1865, 100 L.Ed.2d 384, 394 (1988) (citations omitted). Under these circumstances, the Court should consider Rupe's due process claim.

#### 2. *Constitutional Standard*

■ The defendant in a capital case has a constitutional right to present *all* relevant mitigating evidence related to his character or the circumstances of the offense at the sentencing phase of his trial. *Mak v. Blodgett,* 970 F.2d 614, 623 (9th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1363, 122 L.Ed.2d 742 (1993). The Supreme Court held in *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978), that the sentencer may not be precluded from "considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *See also Mak,* 970 F.2d at 623. "Equally clear is the corollary rule that the sentencer may not refuse to consider or be precluded from considering 'any relevant mitigating evidence.'" *Skipper v. South Carolina,* 476 U.S. 1, 4, 106 S.Ct. 1669, 1671, 90 L.Ed.2d 1 (1986) (quoting *Eddings v. Oklahoma,* 455 U.S. 104, 114, 102 S.Ct. 869, 877, 71 L.Ed.2d 1, 11 (1982)). Mitigating evidence is evidence that "might serve 'as a basis for a sentence less than death.'" *Skipper,* 476 U.S. at 4–5, 106 S.Ct. at 1671 (quoting *Lockett,* 438 U.S. at 604, 98 S.Ct. at 2954). Thus,

> "States cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the penalty. In this respect, the State cannot channel the sentencer's discretion, but must allow it to consider any relevant information offered by the defendant."

*Romano v. Oklahoma,* —— U.S. ——, ——, 114 S.Ct. 2004, 2009, 129 L.Ed.2d 1, 10 (1994) (quoting *McCleskey v. Kemp,* 481 U.S. 279, 306, 107 S.Ct. 1756, 1774, 95 L.Ed.2d 262 (1987)). The Supreme Court has also held, however, that this standard does not limit "the traditional authority of a court to exclude, *as irrelevant,* evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Lockett,* 438 U.S. at 605 n. 12, 98 S.Ct. at 2965 n. 12, 57 L.Ed.2d at 990 n. 12 (emphasis added).

### 3. *Discussion*

 It is well established that relevant evidence is evidence that has " 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " *McKoy v. North Carolina,* 494 U.S. 433, 440, 110 S.Ct. 1227, 1232, 108 L.Ed.2d 369, 379 (1990) (quoting *New Jersey v. T.L.O.,* 469 U.S. 325, 345, 105 S.Ct. 733, 744–45, 83 L.Ed.2d 720 (1985)). This definition of relevance applies to mitigating evidence in the sentencing phase of a capital proceeding. *Id.,* 494 U.S. at 440, 110 S.Ct. at 1232.

There is no question that the Yovetich polygraph evidence was "relevant" within the meaning of *Lockett* and *Eddings* because it related to the "circumstances of the offense." Specifically, it was relevant to Rupe's relative culpability, a factor specifically recognized as relevant under Washington law. RCW § 10.95.070(4).[14] Throughout Rupe's first trial in the guilt and penalty phases, and at Rupe's second penalty trial, Rupe's counsel challenged Yovetich's claim that he was not involved in the robbery or murders. At the second penalty trial, Rupe testified that he did not commit the crimes and that he saw Yovetich outside the bank immediately prior to the time the tellers were killed. More-over, Rupe's counsel effectively cross-examined Yovetich to bring out numerous inconsistencies in Yovetich's statements to police and his testimony at trial. In closing argument, Rupe's counsel argued that based on the inconsistencies in Yovetich's story the jury should consider as a mitigating circumstance the possibility that Monte Yovetich played a greater role in the crimes than he admitted:

> ... The second reason[:] might there be more than Mitch involved in this crime? And if so, what is that involvement? Do we know? Is Mitch and Monte involved? Is Mitch and Marlon [15] involved or are all three of them involved? Does that not raise some concern?

20 REC 10216–10217. The prosecutor, for his part, acknowledged in closing argument that Yovetich's role in the robbery and murders was an issue at the penalty trial:

> ... Either Marlon Townsend and Monte Yovetich were involved, they were not involved, or they were involved with the defendant. Those are the three choices.

20 REC 10273.

Having reviewed Yovetich's testimony, particularly on cross-examination, in the context of the entire record, the Court concludes that the jurors likely found that Yovetich was not entirely truthful in describing the events surrounding the crime. Yet, there was no evidence in the record, other than Rupe's own testimony which itself contained inconsistencies, tending to show that Yovetich played a larger role in the crime than he admitted. The prosecutor exploited this fact by arguing to the jury: "There is not one shred of evidence other than Mr. Rupe's statement that Yovetich did it." 20 REC 10202.[16] He also argued that the evidence was "inconsistent with Mr. Yovetich, as Mr.

---

14. RCW 10.95.070(4) provides that the jury may consider as a relevant factor "[w]hether the defendant was an accomplice to a murder committed by another person where the defendant's participation in the murder was relatively minor."

15. "Marlon" refers to Marlin Townsend, a friend of Monte Yovetich. According to Yovetich, Yovetich and Townsend hid the money and the gun after Rupe admitted that he had robbed the bank.

Marlin Townsend's testimony generally confirmed Yovetich's account of their activities after the robbery and murders.

16. The prosecutor also argued: "Is there any iota of evidence they were involved at the bank other than Mitchell Rupe's statements he saw Monte Yovetich riding up on a motorcycle?" 20 REC 10273.

Rupe has tried to describe him, being involved." 20 REC 10197. Finally, in closing argument, the prosecutor characterized the inconsistencies in Yovetich's statements as attempts "to minimiz[e] some the things he originally said to police." 20 REC 10274. The prosecutor then argued repeatedly that when confronted by the police with further information, Yovetich "became cooperative," telling a story that did not "sound rehearsed," and "showing them where the money was, showing them where the gun was, and showing them where one holster was." 20 REC 10168, 10274.[17] The prosecutor added:

> Why did the police suggest Monte Yovetich is involved? *It's the Police Department's job to try to find out the truth. Their job is a search for the truth.* The police ask some hard questions of Mitchell Rupe. Mitchell Rupe confessed. *The police asked questions of Monte Yovetich and Marlon Townsend, and they told them what happened.*

20 REC 10282 (emphasis added). The essence of the prosecutor's arguments on this subject was that when Yovetich was questioned by police concerning his involvement in the crimes, Yovetich told the truth. Any inconsistencies in Yovetich's statements were attributable to Yovetich's early reluctance to admit any involvement. Under these circumstances, evidence that Yovetich failed a polygraph examination administered by the Olympia Police Department concerning his role in the robbery and murders was highly relevant to a critical issue in the penalty phase of Rupe's trial: the relative culpability of Yovetich and Rupe.

The Yovetich polygraph evidence was also "mitigating" because it raised doubts as to whether Yovetich, the State's chief witness, was credible, and tended to support Rupe's claim that Yovetich was involved to some greater degree in the crime. Because the polygraph evidence could have raised additional doubts[18] in the minds of the jurors as to Rupe's relative culpability and thus "might [have] serve[d] as a basis for a sentence less than death," it was clearly "mitigating" evidence.[19]

That the Yovetich polygraph results constitute relevant mitigating evidence is further supported by *Mak*, 970 F.2d at 622–24. In that case, petitioner Kwan Fai Mak was sentenced to death for the murder of thirteen patrons and employees of the Wah Mee gambling club in Seattle. Upon a petition for writ of habeas corpus, the Ninth Circuit ruled that the state trial judge erroneously excluded at the penalty phase circumstantial evidence from which it might be inferred that petitioner Mak's co-defendant and a third party may have planned the massacre. The court held that Mak had a constitutional right to present *all* relevant mitigating evidence related to his character or the circumstances of the offense at the sentencing phase of his trial. Evidence showing that someone other than Mak may have planned the massacre was relevant to Mak's relative culpability in the crime, and thus could not be excluded.

The respondent argues that while a defendant must generally be permitted to introduce any mitigating evidence related to the circumstances of the offense at the sentencing phase of a capital trial, this rule does not eliminate the traditional authority of the

---

17. The prosecutor suggested several times during closing argument that Yovetich essentially "came clean" after being confronted by police and was therefore more credible than Rupe. *See, e.g.,* 20 REC 10168, 10274, 10282. The prosecutor also argued that Yovetich's testimony was "entirely consistent" with Mitchell Rupe's third statement to police. 20 REC 10199.

18. Because there was no other independent evidence suggesting Yovetich played a significant role in the robbery and murders, the Court also finds that the Yovetich polygraph evidence, if admitted, would not have been cumulative of other evidence in the record.

19. In finding that the polygraph evidence was "mitigating," that is, that it might have served as the basis for a sentence less than death, the Court is mindful that under Washington law, the State has the burden to convince *each* of the twelve jurors beyond a reasonable doubt that there are not "sufficient mitigating circumstances" to merit life imprisonment without parole rather than death. *Kwan Fai Mak v. Blodgett,* 754 F.Supp. 1490, 1501 (W.D.Wash.1991), *aff'd,* 970 F.2d 614 (9th Cir.1992). If even one juror is not convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances, the sentence must be life imprisonment.

states "to apply their rules and exclude evidence." Respondent's Second Supplement to First Amended Answer (docket no. 140) at 2. It was proper, therefore, the State argues, for the trial court to exclude evidence the Washington Supreme Court had described as "clearly unreliable." However, federal due process may require the admission of evidence that could otherwise properly be excluded under state evidentiary rules. *Mak*, 970 F.2d at 623.

▮ In *Mak*, the Ninth Circuit rejected a similar argument by the State that failure to satisfy the State's rules of relevance rendered circumstantial evidence concerning the defendant's culpability inadmissible at both the guilt and penalty phases of the trial. The court stated:

> This is certainly wrong. The Supreme Court has repeatedly found evidence to be "relevant" to capital sentencing although the State had held it irrelevant under State rules of evidence.

*Id.* Thus, under *Mak*, evidence tending to show diminished culpability of the defendant in a capital case is relevant mitigating evidence under federal law that must be admitted in the sentencing phase of the capital proceeding, even if it fails to satisfy state rules of relevance.

▮ *Mak* is not dispositive, however, of Rupe's due process claim based on the exclusion of the polygraph evidence. The mitigating evidence at issue here was not excluded on relevance grounds but rather because it failed to meet certain standards of *reliability*. Thus, the question presented in this case is whether the state may exclude, at the sentencing phase of a capital trial, relevant mitigating evidence on grounds that it lacks certain assurances of trustworthiness. The Court concludes that under the facts of this case, the exclusion of such evidence deprived the petitioner of due process.

The Supreme Court, in *Lockett, Eddings* and similar cases, "intended to describe . . . a class of evidence which *must* be received." *Payne v. Tennessee*, 501 U.S. 808, 822, 111 S.Ct. 2597, 2607, 115 L.Ed.2d 720, 733 (1991) (emphasis in original). While the Court has acknowledged the traditional authority of the

state courts "to exclude, *as irrelevant*, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense," *Lockett*, 438 U.S. at 605 n. 12, 98 S.Ct. at 2965 n. 12, 57 L.Ed.2d at 990 n. 12 (emphasis added), the Court has consistently held that any other barriers to the consideration of relevant mitigating evidence must fall. *See, e.g., Skipper*, 476 U.S. 1, 7, 106 S.Ct. 1669, 1672, 90 L.Ed.2d 1, 8 (a rule that would have the effect of precluding the defendant from presenting relevant mitigating evidence for the explicit purpose of convincing the jury that his life should be spared would not pass muster).

While the Supreme Court has not addressed the precise issue, it has suggested that barriers to the consideration of relevant mitigating evidence based on reliability of that evidence would violate the principle established by *Lockett* and *Eddings*. In *McKoy v. North Carolina*, 494 U.S. 433, 441–42, 110 S.Ct. 1227, 1232–33, 108 L.Ed.2d 369, 380 (1990), the Supreme Court invalidated North Carolina's capital sentencing scheme to the extent it prevented juries from considering, in deciding whether to impose the death penalty, any mitigating factor that the jury did not unanimously find. The Court held that this "unanimity requirement" violated the Eighth Amendment by preventing the sentencer from considering and giving effect to *all* mitigating evidence. In so holding, the Court stated:

> Nor can the State save the unanimity requirement by characterizing it as a standard of proof intended to ensure the *reliability* of mitigating evidence. . . . The Constitution *requires* States to allow consideration of mitigating evidence in capital cases. Any barrier to such consideration must therefore fall.

*Id.*, 494 U.S. at 441–42, 110 S.Ct. at 1233, 108 L.Ed.2d at 380 (first emphasis added).

Furthermore, the Court has emphasized that it is the function of the sentencer to *weigh* the mitigating evidence in a capital case. *See, e.g., Turner v. Murray*, 476 U.S. 28, 34, 106 S.Ct. 1683, 1687, 90 L.Ed.2d 27, 35 (1986) ("our cases establish that every capital sentencer must be free to weigh relevant mitigating evidence before deciding whether

to impose the death penalty") (citing *Lockett* and *Eddings* ). State evidentiary rules that preclude consideration of relevant mitigating evidence impair this function of the jury, and "create[ ] the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty." *Lockett,* 438 U.S. at 605, 98 S.Ct. at 2965, 57 L.Ed.2d at 990.

In *Eddings,* the Court held that a state trial judge erred by refusing to consider evidence of the defendant's violent family history in reaching his decision to impose the death penalty. In reversing Eddings' death sentence, the Court observed:

> Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law,* any relevant mitigating evidence. In this instance, it was as if the trial judge had instructed a jury to disregard the mitigating evidence Eddings proffered on his behalf. The sentencer ... may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration.

*Eddings,* 455 U.S. 104, 113–14, 102 S.Ct. 869, 876–77, 71 L.Ed.2d 1, 10–11 (emphasis in original). In light of these principles, it is clear that a state evidentiary rule may not be applied so as to preclude the sentencer from weighing *all* relevant mitigating evidence. *Cf. Green v. Georgia,* 442 U.S. 95, 97, 99 S.Ct. 2150, 2151, 60 L.Ed.2d 738, 741 (1979) (exclusion of double hearsay testimony that was highly relevant to critical issue in the punishment phase of capital case, i.e., defendant's participation in the crime, was unconstitutional).

The real issue here, as articulated succinctly by a Georgia state trial court, is "whether or not we have any rules of evidence in the sentencing phase of a death penalty case so far as the defendant is concerned." *Alderman v. Zant,* 22 F.3d 1541, 1557 n. 17 (11th Cir.1994). In *Alderman,* a petitioner who had been sentenced to death for murder in Georgia appealed the district court's denial of his habeas petition. One of his claims was that the Georgia trial court improperly excluded relevant mitigating evidence from his sentencing trial in violation of his due process rights. The Georgia trial court had excluded nine-year-old double hearsay testimony, concluding that it was without persuasive assurances of trustworthiness. The Eleventh Circuit affirmed the exclusion of the evidence, holding that notwithstanding the teachings of *Lockett,* "a judge still retains the discretion to exclude otherwise inadmissable [sic] evidence which it determines lacks considerable assurances of trustworthiness." *Id.* at 1557 (citing *Chambers v. Mississippi,* 410 U.S. 284, 300, 93 S.Ct. 1038, 1048, 35 L.Ed.2d 297 (1973)). On its face this statement has considerable merit. This Court concludes, however, that *Alderman* 's reliance on *Chambers* was misplaced. In *Chambers,* the Supreme Court was not required to decide "whether, under other circumstances, it might serve some valid state purpose by excluding untrustworthy testimony" because the hearsay statements at issue there "provided considerable assurance of their reliability." *Id.,* 410 U.S. at 300, 93 S.Ct. at 1048, 35 L.Ed.2d at 312. Thus, the Supreme Court did not reach this precise issue in *Chambers.* In fact, in *McKoy v. North Carolina,* a later case, the Supreme Court found that relevant mitigating evidence could *not* be excluded by applying a "standard of proof intended to ensure the reliability of mitigating evidence." 494 U.S. at 441, 110 S.Ct. at 1233, 108 L.Ed.2d at 380.

In concluding that the federal constitution requires the admission of *all* relevant mitigating evidence, this Court is very mindful, from a review of the entire record, that there is overwhelming evidence that Rupe committed these gruesome murders. Rupe in fact admitted he shot the victims when interviewed by the police on at least three occasions. *See* Exhibits 53, 55 and 57. Although he later retracted these confessions and denied his involvement, there was substantial evidence supporting his conviction. Notwithstanding strong evidence of guilt, a defendant is entitled to present to the jury during the penalty phase any and all relevant mitigating evidence for the purpose of attempting to convince the jury that his life should be spared.

It is true that courts look with disfavor on polygraph evidence. In this case, the Washington Supreme Court described the very polygraph evidence at issue as "clearly unreliable," and a strong case can be made for the proposition that it was unreliable given the circumstances under which the test was administered. The federal appellate decisions which have considered similar issues, however, have stated with no uncertainty that a person facing death must be permitted to present any and all relevant mitigating evidence. At the penalty stage of a capital case it is wise to put aside the normal rules of evidence and permit the defendant to present any relevant mitigating evidence. While it is possible that the polygraph evidence would not have changed the mind of any single juror, we simply do not know for certain. Thus, the conclusion reached by the Washington Supreme Court in *Bartholomew* (polygraph results are admissible by the defense in a sentencing phase of a capital case) [20] and the United States Supreme Court in *Eddings* (sentencer may not refuse to consider as a matter of law any relevant mitigating evidence) compels the conclusion that petitioner must be granted relief on this claim.

In finding that the Eighth and Fourteenth Amendments require the admission of the Yovetich polygraph evidence despite its failure to meet state standards of reliability, the Court is not suggesting that the State cannot challenge the reliability of the evidence. To the contrary, under Washington law the State may present rebuttal evidence challenging the mitigation evidence raised by the defendant, provided the rebuttal value of the evidence outweighs its prejudicial effect. *See Bartholomew*, 101 Wash.2d 631, 683 P.2d 1079; *Kwan Fai Mak*, 754 F.Supp. at 1495. The individual jurors will then decide how much weight to accord the polygraph evidence.

 Finally, the Court rejects the State's argument that the polygraph evidence was properly excluded because Rupe had no right to revisit the issue of his guilt at the sentencing phase of his trial. The State relies on *Franklin v. Lynaugh*, 487 U.S. 164, 174, 108 S.Ct. 2320, 2327, 101 L.Ed.2d 155 (1988), in which the Supreme Court held that defendants in a capital case have no constitutional right to have residual doubts over their guilt considered as a mitigating factor in the sentencing phase. The Court reasoned, "[s]uch lingering doubts are not over any aspect of petitioner's 'character,' 'record,' or a 'circumstance of the offense.'" *Id.* The State's reliance on *Franklin* is misplaced. While it is true under *Franklin* that Rupe could not seek to admit the Yovetich polygraph evidence solely to show that Rupe did not commit the crime, *Franklin* does not preclude the admission of evidence suggesting that an accomplice or accessory may have played a larger role in the crime than admitted. To the contrary, due process requires the admission of such evidence because it relates to a mitigating circumstance, relative culpability.[21] *Mak*, 970 F.2d at 623.

**20.** In *Bartholomew*, 101 Wash.2d at 646, 683 P.2d 1079, the Washington Supreme Court held that polygraph results "are admissible by the defense at the sentencing phase of capital cases, subject to certain restrictions." As discussed earlier, the court adopted two requirements: (1) the examiner must be qualified and the test conducted under proper conditions; and (2) if the polygraph and examiner's opinion are offered in evidence, the opposing party has the right to challenge the examination. In *Bartholomew*, the State's principal witness, the defendant's brother, had "negative" polygraph results, and the brother's girlfriend had "inconclusive" results. The court held that the results of both tests were admissible under the standard in *Lockett*, 438 U.S. 586, 98 S.Ct. 2954. The Court finds it difficult to distinguish the *Bartholomew* case from the present case.

**21.** In a letter to the Court dated August 10, 1994, the State cited *Romano v. Oklahoma*, —— U.S. ——, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994), as further support for its argument that the state court may properly exclude evidence in the penalty phase of a capital proceeding on grounds of reliability. In *Romano,* the Court stated, "The Eighth Amendment does not establish a federal code of evidence to supersede state evidentiary rules in capital sentencing proceedings." *Id.,* —— U.S. at ——, 114 S.Ct. at 2011. The *Romano* case, however, dealt with the trial court's admission of evidence to support an aggravating circumstance, not the refusal of a trial court to admit relevant mitigating evidence. In *Payne,* 501 U.S. at 824–25, 111 S.Ct. at 2607–08, the Court recognized that different standards apply to these two categories of alleged evidentiary errors. While the Court has refused to carve out

■ There is an additional basis for finding that the exclusion of the polygraph evidence violated Rupe's due process rights. Due process requires that "a defendant not be sentenced to death 'on the basis of information which he had no opportunity to deny or explain.'" *Skipper*, 476 U.S. at 5 n. 1, 106 S.Ct. at 1671 n. 1, 90 L.Ed.2d at 7 n. 1 (quoting *Gardner v. Florida*, 430 U.S. 349, 362, 97 S.Ct. 1197, 1207, 51 L.Ed.2d 393 (1977)). Here, the prosecutor's closing argument emphasized that Yovetich cooperated with the police and told them the truth when questioned about the robbery and murders. He also argued strongly that there was not one shred of evidence other than Rupe's own testimony suggesting that Yovetich was involved in the robbery and murders. Because the polygraph evidence was excluded, Rupe was denied an opportunity to challenge these arguments.

The Court concludes that Rupe's Fifth, Eighth and Fourteenth Amendment rights were violated by the refusal of the trial court to admit the Yovetich polygraph evidence at the second penalty trial.[22] Rupe's petition for writ of habeas corpus is granted as to claim 5.3.

### III. CLAIMS 5.13, 5.14 AND S.5.21—ADMISSION OF GUN COLLECTION EVIDENCE

#### A. The First Penalty Trial

During the penalty phase of petitioner's first trial, the State introduced testimony regarding petitioner's possession of guns unrelated to the crime, and the court admitted into evidence several firearms and ammunition. Exs. 1–7; 9 REC 4616–4619, 4626– 4628, 4632. The testimony, which spans 25 pages of trial transcript, concentrated primarily on petitioner's possession of a CAR 15 rifle, a weapon not used in the crimes of which petitioner was convicted.

Darrell Noble, who searched petitioner's residence, testified that he observed several weapons mounted on a wall rack, including a loaded CAR 15. Ex. 3, 9 REC 4613–4615. He testified that he later took into custody several weapons and ammunition including the CAR 15, Ex. 3, an ammunition pouch with bullets and clips for the CAR 15, Ex. 7, a .12 gauge shotgun, Ex. 2, and a .357 Thompson Contender pistol with an interchangeable .22 caliber barrel, Ex. 6. James A. Hellstrom, a detective with the City of Olympia Police Department, identified a lever-action rifle with a fabric case that was "obtained ... from the defendant's Bronco" on the day of the robbery and murders. Ex. 1; 9 REC 4632.

The State also called John R. Easley, Director of Maintenance for the Military Department, State of Washington and an officer in the Army National Guard, who testified that the CAR 15 is a civilian version of the standard Army M–16 rifle. 9 REC 4621– 4623. He testified that "C.A.R. stands for Combat Assault Rifle" and that the weapon is "used for close-type fire." 9 REC 4623– 4624.

Michael Peck, King County Area Supervisory Agent of the Washington Department of Game, testified that although it is legal in Washington to use the CAR 15 to hunt "varmints" such as coyotes, crows, raccoons, bobcats, and groundhogs, none of petitioner's rifles or shotguns were "good varmint weap-

---

a category of aggravation evidence that must be excluded, it has described, in *Lockett, Eddings* and similar cases, "a class of evidence which *must* be received." *Payne*, 501 U.S. at 822, 111 S.Ct. at 2607 (emphasis in original).

**22.** In holding that the trial court could not exclude the Yovetich polygraph results on the basis of reliability, the Court is not suggesting that reliability can never be the basis for excluding evidence from the penalty phase of a capital proceeding. There may be cases where it is appropriate to exclude potentially mitigating evidence on the basis of reliability. This, however, is not such a case. As the State's polygraph

expert admitted, the Yovetich polygraph results were conclusive and had "some value" despite the problems identified by Officer Midthun and the State's expert. Moreover, although the Washington Supreme Court characterized the polygraph evidence as "clearly unreliable," the trial judge had not so characterized the evidence. Rather, the trial judge had concluded that the evidence did not meet the standards of reliability set forth in pre-*Bartholomew* cases concerning the admissibility of polygraph evidence generally. Finally, *Bartholomew* preserves the integrity of the capital sentencing process by permitting the State to introduce rebuttal evidence concerning the questionable validity of the polygraph results.

ons." 9 REC 4636. Peck also testified that it is illegal to use the weapon to hunt big game. 9 REC 4634. The State also elicited the following testimony from Mr. Peck concerning the CAR 15:

Q: Showing you Exhibit No. 3, what is this good for in terms of hunting purposes?

A: Are you asking my opinion?

Q: Yes.

A: AR 15 was designed as an anti-personnel rifle.

Q: Combat weapon?

A: Yes.

Q: Are there weapons for hunting varmints or other animals more efficient and effective than that weapon?

A: Quite a few, yes, sir.

9 REC 4637.

The State referred to the testimony about gun ownership in its closing argument, arguing:

[H]ow they are. used and their possession and the reason for their possession may give you some insight into the possessor or owner, and I will let you draw your inferences from them, whether one explanation of them that appears on the surface to be rather innocuous is consistent with the defendant's acts, background, and capability of doing what he did on the 17th of September, 1981.

That Car 15 Combat Assault Rifle, as its primary function and purpose, is an anti-personnel weapon. . . . an assault weapon to gun groups of people down in combat situations, people.

9 REC 4752–4753.

### B. *Rupe I*

The Washington Supreme Court reversed Rupe's death sentence because of the admission of evidence of petitioner's gun ownership during the penalty phase of his trial. *State v. Rupe*, 101 Wash.2d 664, 683 P.2d 571 (1984) ("*Rupe I*"). The court noted that Rupe was entitled under the Washington Constitution to possess weapons. *Id.* at 706–707, 683 P.2d 571 (citing Wash. Const. art. 1 § 24). The Court then applied the established rule of both federal and state law that due process forbids a state to "draw adverse inferences from the exercise of a constitutional right." *Id.*, 101 Wash.2d at 705, 683 P.2d at 595 (citations omitted). The Court reasoned that:

[I]n arguing that defendant's exercise of that constitutional right meant that he deserved the death penalty, the State attempted to draw adverse inferences from defendant's mere possession of these weapons. Our constitution, and the due process analysis contained in *Zant,* prohibits use of this evidence.

Defendant's sentence of death must therefore be reversed.

*Id.*, 101 Wash.2d at 707, 683 P.2d at 597.

The Court rejected the State's argument that the admission of the gun evidence was harmless, finding that the evidence was highly prejudicial because:

Personal reactions to the ownership of guns vary greatly. Many individuals view guns with great abhorrence and fear. Still others may consider certain weapons as acceptable but others as "dangerous." A third type may react solely to the fact that someone who has committed a crime has such weapons. Any or all of these individuals might believe that defendant was a dangerous individual and therefore deserved to die, just because he owned guns. This was, in fact, the crux of the prosecutor's argument to the jury for defendant's death. Consequently, we reject the State's argument that no prejudice resulted from admission of these weapons.

*Rupe I*, 101 Wash.2d at 708, 683 P.2d 571. The Court remanded for a new penalty-phase trial.

### C. *The Second Penalty–Phase Trial*

During petitioner's second penalty trial, which lasted ten days, the State called on F.B.I. Special Agent Peter Shepp to testify about his investigation of petitioner.[23] Shepp

---

23. Agent Shepp testified at the first penalty trial about his investigation of Rupe but did not men-

tion any weapons other than the .357 caliber revolver used in the murders. Prosecutor Tabor

testified during the afternoon of the first day of the proceeding. After Shepp testified about Rupe's cooperation with law enforcement officials and his attempts to give them information about the robbery, the prosecutor asked Shepp about weapons owned by petitioner:

Q: Did you ask Mr. Rupe if he owned any firearms?

A: I did.

Q: What did he tell you?

A: He told me he had a .357 caliber revolver. However, he said at that time he had loaned it to a Monte Yovetich, who resided on Holman Street in Shelton, Washington, but was now somewhere in Okanagan, and that is why he loaned the weapon to him, because he wanted to take it hunting. He also had a 12–guage [sic] Remmington shotgun, a Colt semi-automatic .22 caliber or carbine, a savage over and under 30–30 caliber 20–guage [sic], which he said was in a gun shop in Bremerton, Washington, Puget Sound Firearms, and a .22 caliber lever action Ithaca rifle.

A: Did you ask Mr. Rupe⸗ about his checkbook at all?

18 REC 8848. Agent Shepp discussed his conversation with petitioner about the checkbook, and petitioner's consent to a search of his locker. He then testified about petitioner's consent to a search of his vehicle:

Q: Did you ask the defendant to allow you to look at any other of his personal belongings?

A: Yes, we asked if we could search his vehicle, which was at the school. He had a Ford Bronco and, again, he was very cooperative, consented to a search.

Detective Shultz and myself and another agent and another police officer searched the vehicle, and we found a couple of weapons. We found a rifle, the Ithaca rifle, and we found a .357 Magnum cartridge, Frontier was the model or manufacturer of the cartridge, a reload, and that was found under the front passenger seat, and there were also two checks made payable to Mr. Rupe, which appeared to have been from a Mrs. Rupe, which coincided with what he had told us about the checks being sent to him.

Q: Did you take anything from his vehicle?

A: We took the rifle and the .357 cartridge.

18 REC 8850. Agent Shepp identified and the State admitted "a .357 Magnum Frontier cartridge semi-jacketed" with "a copper semi-jacket on it and hollow point." [24] Ex. 27; 18 REC 8851. Mr. Shepp went on to discuss his further contact with and questioning of petitioner. Later in his testimony, on cross examination by Rupe's counsel, Mr. Shepp returned to the subject of the contents of petitioner's vehicle and volunteered an inference to be drawn from the condition of the vehicle and its contents:

Q: How would you describe the condition of Mr. Rupe's Bronco?

A: Very cluttered.

Q: With what?

A: He had camping gear, some knives, *Soldier of Fortune* magazine. It made me think he was like a survivalist-type individual.

18 REC 8862–8863.

Mr. Rupe's use or ownership of guns was mentioned again several times in the second penalty trial by prosecution and defense witnesses,[25] and Rupe

has testified that he expected Shepp to testify similarly at the second penalty trial.

24. Petitioner does not challenge mention of the .357 caliber revolver or .357 cartridges because the homicides were committed through use of such a weapon.

25. For example, Rupe's counsel asked Jay Himlie, a close friend of Mr. Rupe's, whether he and Rupe ever went shooting together, whether Rupe used or carried a gun more frequently after leaving the Army, and where Rupe usually kept his gun. 20 REC 9890–92. Himlie testified that he and Rupe were on the rifle team in high school, and sometimes they went target shooting together. Himlie stated: "I would take my pellet rifle, and he would take his dad's .22, and we would shoot at the leftover targets out there." 20 REC 9891. Himlie further testified in response to

himself,[26] although such references were limited.to Rupe's possession of the .357 Magnum revolver that was connected with the murders and the rifle found in his truck. *See* 19 REC 9133, 9135–36, 9677, 9714–15; 20 REC 9891–92, 10045. Unlike Rupe's first penalty trial, the prosecutor did not refer to Rupe's gun ownership in his closing arguments. Petitioner's challenge to the admission of gun evidence in the second penalty trial is limited to the testimony of Agent Shepp.

Gary Tabor, the deputy prosecutor during petitioner's first and second penalty trial, recently testified by affidavit that he understood after reading *Rupe I* that "the evidence of firearms, other than the .357 revolver involved in the crimes, would not be admissible" in the second penalty trial. Tabor Affid. at 4. Mr. Tabor also testified during the hearing that evidence of petitioner's ownership and possession of guns not related to the crimes of conviction was irrelevant.

For purposes of this summary judgment motion, the State concedes that Agent Shepp's testimony concerning Rupe's gun collection was inadmissible under *Rupe I*, and thus violated state law. The State argues nevertheless that the testimony did not violate petitioner's federal due process rights. Supplemental Brief in Support of Motion for Summary Judgment at 5.[27]

D. *Analysis*

1. *Federal Due Process and Fundamental Fairness*

■ In *Henry v. Estelle*, 993 F.2d 1423 (9th Cir.1993), *amended, reh'g en banc de-nied*, 33 F.3d 1037 (9th Cir.1993), the Ninth Circuit formulated the following test for determining when state criminal proceedings violate federal due process rights:

[D]enial of due process in a state criminal trial "is the failure to observe that fundamental fairness essential to the very concept of justice. [The court] must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial." *Lisenba v. California*, 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166 (1941).

*Henry*, 33 F.3d at 1041. *See also Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991) (when reviewing the erroneous admission of testimony, the court must "consider whether the admission of the evidence so fatally infected the proceedings as to render them fundamentally unfair").

■ In arguing that the admission of the Shepp testimony rendered his trial fundamentally unfair, Rupe relies on *McKinney v. Rees*, 993 F.2d 1378 (9th Cir.), *cert. denied*, — U.S. —, 114 S.Ct. 622, 126 L.Ed.2d 586 (1993). The testimony at issue in *McKinney*, like that in this case, centered around the defendant's ownership of weapons not connected with the crime. McKinney was convicted of murdering his mother whose throat was slit. The medical examiner testified that the cuts could have been made by almost any kind of knife, including ordinary kitchen knives. None of the knives at the scene bore any sign of blood, and the murder weapon was never identified. The

questions by Rupe's counsel that one of the first things Rupe did after he left military service was to get a concealed weapons' permit, and "it bothered my wife a lot when she was carrying his gun around." *Id.* Himlie testified that Rupe later explained to Himlie's wife: "I have been carrying a sidearm in the military for years, and I feel naked without it." *Id.*

26. For example, in response to questions from his counsel concerning weapons in his Bronco, Rupe testified that "there was a rifle in the gun rack in the back." 19 REC 9677. When asked to describe it, Rupe said it was "An R–15." *Id.* Rupe further testified that two days before the murder he considered robbing the Tumwater State Bank. He testified: "I took my satchel, and I had my revolver in the satchel, and

checked the loaded revolver, and got out of the Bronco, and walked to the bank." 19 REC 9678. He then testified that he "decided not to do it." *Id.*

27. Rupe's counsel did not object to the admission of Agent Shepp's testimony at the second penalty trial, nor did he identify the issue of admission of the irrelevant gun evidence on appeal from the second penalty trial. *See State v. Rupe*, 108 Wash.2d 734, 743 P.2d 210 (1987) ("*Rupe II*"); *In re Rupe*, 115 Wash.2d 379, 798 P.2d 780 (1990) ("*Rupe III*"). This Court has previously ruled that Rupe's claims based on the admission of the irrelevant gun evidence are not procedurally barred. *See* Order dated Oct. 14, 1993, docket no. 145.

state introduced evidence of the defendant's possession of a TEKNA-like knife, which is a double-edge, dagger-type knife, and presented testimony that McKinney was proud of his "knife collection," that on occasion he strapped a knife to his body while wearing camouflage pants, and that he used a knife to scratch the words "Death is His" on the door of his closet. The prosecutor questioned McKinney about his "fascination" with knives and in closing argument, argued that McKinney's connection to these knives, any one of which could have been the murder weapon, was important.

The Ninth Circuit concluded that most of the evidence concerning McKinney's fascination with and collection of knives was irrelevant and emotionally charged. The court stated that the "jury was offered the image of a man with a knife collection, who sat in his dormitory room sharpening knives, scratching morbid inscriptions on the wall, and occasionally venturing forth in camouflage with a knife strapped to his body." *Id.* at 1385. Such evidence "served only to prey on the emotions of the jury, to lead them to mistrust McKinney, and to believe more easily that he was the type of son who would kill his mother in her sleep without much apparent motive." *Id.* As a result, the Ninth Circuit concluded that McKinney's trial was "impermissibly tainted by irrelevant evidence such that it is more than reasonably likely that the jury did not follow its instructions to weigh all the evidence carefully, but instead skipped careful analysis of the logical inferences raised by the circumstantial evidence and convicted McKinney on the basis of his suspicious character and previous acts, in violation of our community's standards of fair play." *Id.*

In coming to its conclusion regarding the impact of the improper testimony, the *McKinney* court noted the absence of a murder confession in the case, that the relevant evidence against defendant was solely circumstantial, the fact that both McKinney and his father were in a position to have committed the murder, and that neither man had a clear motive. *Id.* at 1385. Under these circumstances, the court held, the emphasis on the defendant's knife ownership rendered the

trial fundamentally unfair and violated the defendant's right to due process.

Rupe's reliance on *McKinney* is misplaced. The weapons evidence at issue in *McKinney* went far beyond the limited gun testimony by Agent Shepp in petitioner's second penalty. The *McKinney* testimony is instead analogous to the gun testimony in Rupe's first penalty trial, which was the basis for reversal of petitioner's death sentence in *Rupe I.* The mention of gun ownership by Agent Shepp in Mr. Rupe's second penalty-phase trial lasted a few moments, and was imbedded in longer testimony regarding Rupe's activities on the day of the murders and the agents' investigation of the crime. The prosecutor said nothing at the time to call particular attention to the testimony, and the prosecutor did not use the testimony in his closing arguments. In contrast, the objectionable testimony in *McKinney* comprised over sixty pages in the record, and the prosecutor relied heavily on McKinney's collection of knives in arguing for conviction. Moreover, the evidence against McKinney was not "weighty," *id.* at 1386, whereas Rupe had confessed to, and been found guilty of, committing the crimes. Finally, the objectionable testimony in *McKinney* had all been presented by the prosecution and was not cumulative of other evidence in the record. In this case Rupe himself had introduced evidence of his interest in guns, which included testimony concerning target shooting, survival techniques, possession of a concealed weapons' permit, and possession of various holsters, for purposes of mitigation.

Having recognized these distinctions, the Court is nevertheless mindful of the prejudicial impact gun testimony may have. In *Rupe I,* the Washington Supreme Court recognized that "personal reactions to the ownership of guns vary greatly," and "many individuals view guns with great abhorrence and fear." *Rupe I,* 101 Wash.2d at 708, 683 P.2d 571. In view of the substantial gun evidence admitted in the first penalty trial, the Washington Supreme Court noted that many individuals "might believe that defendant was a dangerous individual and therefore deserved to die, just because he owned guns." *Id.* Similarly, the Ninth Circuit has

recognized that "Rightly or wrongly, many people view weapons, especially guns, with fear and distrust." *United States v. Hitt,* 981 F.2d 422, 424 (9th Cir.1992). In *Hitt,* the Ninth Circuit concluded that if jurors thought the defendant before them was the owner of several guns, "they might well have concluded [defendant] was the sort of person who ... was so dangerous he should be locked up regardless of whether or not he committed this offense." [28] *Id.*

Viewing the record in this case as a whole, however, the Court cannot find that Agent Shepp's testimony "so fatally infected the proceedings as to render them fundamentally unfair." *Jammal,* 926 F.2d at 919. There was other evidence in the record, most of which was presented by petitioner, concerning Rupe's interest in and possession of guns. Agent Shepp's testimony was limited to describing by name four guns owned by Rupe, at least one of which could have been "the rifle" or "pistol" referred to in other testimony. The guns were not admitted, and there was no further description or characterization of the guns in the record. Moreover, the prosecutor did not draw any adverse inferences from the gun testimony, nor did he rely on it in arguing that there were not sufficient mitigating circumstances to merit leniency.

■ Rupe argues that the impact of the gun testimony was exacerbated by Agent Shepp's reference to finding a *Soldier of Fortune* magazine in petitioner's vehicle and his remark that the magazine suggested to Agent Shepp that Rupe was "a survivalist-type individual." 18 REC 8862–8863. The Court concludes, however, that these comments, considered in the context of the entire record, did not so fatally infect the proceedings as to render them fundamentally unfair. The record was replete with references to Rupe's interest in the military, survival techniques, search-and-rescue endeavors and shooting guns. Most of this evidence was presented by Rupe himself in mitigation. Moreover, the prosecutor never used this testimony or Agent Shepp's comments to portray Rupe as a "commando." For these reasons, the Court concludes that Agent Shepp's gun testimony did not violate Rupe's federal due process rights.

■ Even if the Court was to conclude that the gun testimony violated petitioner's due process rights, in order to grant *habeas corpus* relief on the basis of the violation this Court "must determine whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *McKinney,* 993 F.2d at 1385 (quoting *Brecht v. Abrahamson,* 507 U.S. ——, ——, 113 S.Ct. 1710, 1713, 123 L.Ed.2d 353 (1993)) (other citation omitted). The question for the Court is "what effect the error had or reasonably may be taken to have had upon the jury's decision." *Id.* at 1386.

■ This standard was recently applied in a death penalty case by the Eleventh Circuit in *Duest v. Singletary,* 997 F.2d 1336, 1338–1339 (11th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1107, 127 L.Ed.2d 418 (1994). The *Duest* court stated that "[t]he essential question is: Did the constitutional error 'substantially influence' the verdict, or, at least, does a 'grave doubt' exist as to whether it did? If so, then the petitioner is entitled to habeas relief." *Duest,* 997 F.2d at 1339 (citations omitted).[29] In view of Wash-

---

**28.** The Court notes, however, that the conclusion by jurors that a gun owner should be locked up is perhaps more likely than a conclusion that a gun owner should be sentenced to death.

**29.** In *Duest,* the evidence at issue was a prior criminal conviction for armed assault with intent to murder that subsequently had been overturned. The court stated that introduction of evidence of the prior crime "helped portray Duest to the jury not only as an individual with a propensity for criminal violence, but as a recidivous killer." *Duest,* 997 F.2d at 1339. During its deliberations, the jury had requested to see the vacated convictions. This fact contributed to the court's finding that evidence of the conviction probably "played a significant role in the jury's ultimate determination that death was the appropriate sentence." *Id.*

The *Duest* court emphasized the 7–5 split among jurors in favor of the death penalty and noted that under Florida law, "a 6–6 split is deemed a recommendation against the death penalty." Because of this, the court held that "habeas relief is warranted in this case if we believe even one of the jurors who voted in favor of the death penalty likely was substantially influenced by the evidence of Duest's prior conviction." *Duest,* 997 F.2d at 1339.

ington's requirement that the jury *unanimously* find that "there are not sufficient mitigating circumstances to merit leniency" before the death penalty may be imposed, Wash.Rev.Code § 10.95.060(4), the question for this Court must be: Did Agent Shepp's testimony about Rupe's gun ownership substantially influence the decision of at least one juror, or, at least, does a grave doubt exist as to whether it did?

The Court concludes that, viewing the record as a whole, it is not reasonable likely that Agent Shepp's testimony substantially influenced any juror's decision, and , no grave doubt exists as to this possibility. The evidence in the record showed that Rupe had confessed to the police and admitted to others that he committed the crimes. The murders were cold and gruesome, and there was substantial evidence of premeditation in the record. Although Rupe had no criminal record and a lengthy military career, and presented an extraordinary number of mitigation witnesses who testified as to his good character, Rupe also chose to testify at the penalty phase that he did not commit the crimes. This strategy may have created the impression in the minds of some jurors that Rupe was insincere, remorseless, and unwilling to take responsibility for his actions. Considering all the circumstances, and viewing the record as a whole, the Court concludes that the gun evidence did not have a substantial or injurious effect on the outcome of petitioner's second penalty trial.

### 2. *The State's Failure to Abide by Washington Law*

 Petitioner also argues that the State's failure to abide strictly by the decision of the Washington Supreme Court that the evidence of other gun ownership was to be excluded in his second penalty trial must result in the conclusion that the second proceedings violated petitioner's federal due process rights. In support of this proposition, petitioner cites *Fetterly v. Paskett*, 997 F.2d 1295 (9th Cir.1993), *reh'g en banc denied*, 15 F.3d 1472 (9th Cir.1994), *petition for cert.*

filed (April 22, 1994). In *Fetterly*, the court held that "where a state has provided a specific method for the determination of whether the death penalty shall be imposed, 'it is not correct to say that the defendant's interest' in having that method adhered to 'is merely a matter of state procedural law.'" *Id.* at 1300 (citing *Hicks v. Oklahoma*, 447 U.S. 343, 346, 100 S.Ct. 2227, 2229, 65 L.Ed.2d 175 (1980)).

Petitioner had "a substantial and legitimate expectation that he [would] be deprived of his liberty only to the extent determined by the jury in the exercise of its [lawful] discretion." *Hicks*, 447 U.S. at 346, 100 S.Ct. at 2229. The Washington Supreme Court determined in petitioner's case that admission of evidence concerning petitioner's gun collection violated petitioner's right under the Washington Constitution to possess weapons free of any adverse inferences, and that such evidence was irrelevant and highly prejudicial. *See Rupe I*, 101 Wash.2d at 704–708, 683 P.2d 571. Under *Hicks*, petitioner was entitled to a sentencing hearing free of such evidence. However, there is nothing in *Rupe I* or in the proceedings of the second penalty phase [30] which suggests an automatic conclusion that petitioner's federal due process rights were violated by the failure to eliminate completely any mention of his possession of guns other than the murder weapon:

> [F]ailure to comply with the state's rules of evidence is neither a necessary nor a sufficient basis for granting habeas relief. While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness.

*Jammal*, 926 F.2d at 919. The question for this Court, then, is whether mention of the guns that were not related to the crime resulted in a lack of fundamental fairness

---

**30.** During the second penalty phase, the trial court did not disregard the *Rupe I* decision. The weapons at issue were not admitted into evidence and the prosecutor did not press the jury to draw any inferences from petitioner's gun collection, as had happened in the first penalty trial. Rather, a single witness described the existence of the guns as part of his broader testimony concerning his investigation of petitioner following the crime.

during petitioner's second sentencing trial. The Court has previously concluded that it did not. For the same reasons discussed earlier in this opinion the Court concludes that the state's failure to eliminate all mention of his possession of guns did not violate petitioner's federal due process rights.

### 3. *Impairment of Petitioner's Constitutional Rights*

■ The Washington Supreme Court has determined that Rupe was entitled under the Washington Constitution to possess weapons, and that introduction of the gun evidence in his first penalty trial unconstitutionally burdened that right. *Id.,* 101 Wash.2d at 706–707, 683 P.2d 571 (citing Wash. Const. art. 1 § 24). Petitioner now argues that the gun testimony in his second penalty trial similarly burdened that right.

This Court does not have authority to review this aspect of petitioner's challenge to the gun testimony because petitioner's challenge is based solely on alleged violation of his state constitutional right to possess guns. The Washington Supreme Court did not hold, and Petitioner does not argue, that he possesses such a right under the United States Constitution. *See Rupe I,* 101 Wash.2d at 706 n. 8, 683 P.2d 571; *Quilici v. Morton Grove,* 695 F.2d 261, 270 (7th Cir. 1982), *cert. denied,* 464 U.S. 863, 104 S.Ct. 194, 78 L.Ed.2d 170 (1983). Thus, petitioner's claim does not raise any federal constitutional concern.[31] *Compare Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (conduct protected by the Federal Constitution); *Dawson v. Delaware,* 503 U.S. ——, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992) (same).

### 4. *Prosecutorial Misconduct*

■ Finally, petitioner argues that his second death sentence should be reversed because the introduction of Agent Shepp's gun testimony during the second penalty trial was the result of prosecutorial misconduct. As proof of his claim, petitioner acknowledges that he must turn to circumstantial evidence.

Rupe notes that at the first penalty trial Agent Shepp provided no gun testimony other than that relating to the .357 revolver connected to the murders. The prosecutor has testified by deposition following the second penalty trial that he intended for Shepp to present similar testimony at the second trial. Rupe argues: "It is hard to understand how, more than three years after the first trial and nearly four years after the police investigation, Shepp independently decided to expand his testimony to include very specific details regarding Petitioner's guns." Petitioner's Supplemental Memorandum at 19 n. 13. Petitioner also points to the initial "open-ended" question asked by the prosecutor concerning whether Rupe owned any firearms (in the plural), his failure to cut off Agent Shepp's answers once Shepp started to reveal information about the other guns, and the prosecutor's failure to instruct Agent Shepp before his testimony that he should not mention any guns not related to the murders. The prosecutor has testified that he immediately recognized that his witness had presented improper testimony regarding the guns. *See* Tabor Dep. at 24, 28. The prosecutor has also testified that he prepared Shepp to testify, but said he cannot recall whether he took any precautions to ensure that his witness would not present the prejudicial gun testimony. *See* Tabor Dep. at 20–30. Petitioner argues that these factors, considered cumulatively, demonstrate a recklessness that rises to the level of affirmative misconduct by the prosecutor.

The Court has reviewed carefully petitioner's challenges in the context of the entire record and holds that the matters referred to by petitioner do not rise to the level of prosecutorial misconduct. *Compare United States v. Kessler,* 530 F.2d 1246 (5th Cir. 1976) (government engaged in intentional misconduct by introducing, over objection and on the basis of inadmissible hearsay declarations, an automatic rifle which had no known connection to the alleged conspiracy and which was not an example of the arms supposedly involved in the conspiracy). For

---

**31.** Even if the Court was to find that a violation of Rupe's state constitutional rights implicated a federal concern, the Court would nonetheless conclude that this violation did not render Rupe's second penalty trial fundamentally unfair.

example, the question about whether Rupe had "any firearms" does not, in standard English usage, necessarily refer to or invite a response that there are any, or more than one, of the items of which the questioner inquires. Indeed, petitioner's attorney asked a similar question of a defense witness regarding Rupe's purported loan of the murder weapon, a single revolver, to a friend: "Do you recall Tuesday, September 15th, having a discussion with Mr. Rupe about *any of his guns.*" REC 10045. Petitioner's other charges of misconduct, including prosecutorial recklessness, are speculative and do not support a finding of prosecutorial misconduct.

### E. *Conclusion*

The Court grants respondents' motion for summary judgment as to Rupe's Claims 5.13, 5.14 and S5.14.

## IV. *CLAIMS 5.22 and 85.22—LIFE IMPRISONMENT AFTER REVERSAL OF ORIGINAL DEATH SENTENCE*

■ In claims 5.22 and S5.22, petitioner argues that on remand from *State v. Rupe,* 101 Wash.2d 664, 683 P.2d 571 (1984) (*"Rupe I "*), the superior court was required to sentence him to life imprisonment without parole instead of conducting the second penalty-phase trial that resulted in a new sentence of death.

Petitioner was resentenced to death according to the procedure set forth in RCW 10.95.050(4), which provides for impanelling of a jury "if a retrial of the special sentencing proceeding is necessary for any reason including but not limited to ... as a consequence of a remand from an appellate court...." RCW 10.95.050(4). Such a proceeding can lead to renewed imposition of the death penalty. RCW 10.95.060. However, under another section of the statute, where a death sentence is "held to be invalid by a *final judgment* of a court after all avenues of appeal have been exhausted by the parties to

the action," the sentence shall be life imprisonment without parole. RCW 10.95.090 (emphasis added).

Petitioner argued before the state court that *Rupe I* was a "final judgment" under 10.95.090 because it was based on state constitutional grounds, and was therefore not subject to further appeal. *State v. Rupe,* Nos. 59408–2 and 59557–7 (Wash. Nov. 3, 1992), slip op. at 6 ("Order of Nov. 3, 1992"); 27 REC 12976. Under this interpretation of *Rupe I,* petitioner would have been subject to a sentence of life imprisonment rather than a second sentencing proceeding. RCW 10.95.090.

The Washington Supreme Court rejected petitioner's claim, holding that *Rupe I* did not constitute a "final judgment" within the meaning of RCW 10.95.090. Order of Nov. 3, 1992, slip op. at 7–8; 27 REC 12977–78.[32] Petitioner now challenges his second penalty-phase trial on the grounds that it violated his federal due process rights.

Rupe first argues that RCW 10.95.090 "allow[s] the state to control the question of whether a defendant would be twice subjected to capital penalty trials" because the decision of state prosecutors whether to seek federal review of an adverse decision affects whether the state court decision is a "final judgment" under the statute. Petitioner argues that this prosecutorial discretion violates due process and equal protection guarantees.

The two state cases cited by petitioner in support of his claim do not support petitioner's argument. *Olsen v. Delmore,* 48 Wash.2d 545, 295 P.2d 324 (1956); *State v. Zornes,* 78 Wash.2d 9, 475 P.2d 109 (1970), *criticized by, Kennewick v. Fountain,* 116 Wash.2d 189, 192–94, 802 P.2d 1371 (1991), and *overruled on other grounds, State v. Benn,* 120 Wash.2d 631, 672, 845 P.2d 289 (1993). Prosecutorial discretion in the choice whether to appeal a court decision is not the

---

**32.** At oral argument, petitioner's attorneys argued that the state court's decision that *Rupe I* was not a "final judgment" was incorrect. However, this Court should defer to the Washington Supreme Court's interpretation of Washington law and its decision that *Rupe I* was not a "final

judgment" under RCW 10.95.090. Even if this Court were to consider the argument on the merits, the Court would also conclude as a matter of law that the state court decision in *Rupe I* was not a final judgment.

type of "unbridled discretion" courts have found in the decision to subject persons who commit similar crimes to different punishments. *Cf. Skinner v. Oklahoma*, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942).

The standards that guide a prosecutor's decision regarding whether to appeal a Washington Supreme Court decision on a matter of federal law include the statutes and cases on which the court based its decision, federal constitutional provisions that protect defendants' rights and the cases that have interpreted them, and the rules of professional responsibility that prohibit filing frivolous or unfounded appeals. Washington's death penalty statute is not unconstitutional because of the prosecutorial discretion involved in deciding whether to appeal a decision of the Washington Supreme Court to the federal courts. *See Kennewick*, 116 Wash.2d at 193–94, 802 P.2d 1371; *Benn*, 120 Wash.2d at 667, 845 P.2d 289.

Rupe also challenges his second sentencing trial on grounds that the *Rupe I* court failed to conduct the independent statutory review of his sentence required under RCW 10.95.100.[33] He argues that if the mandatory review had been conducted, his first death sentence would have been reversed because it was improperly based on "passion or prejudice." A remand under these circumstances, according to Rupe, would have resulted in an automatic sentence of life without parole. Petitioner argues that the state court's failure to conduct the mandatory review violated Washington law, and also violated petitioner's federal due process rights.

RCW 10.95.100 provides that the Washington Supreme Court "shall" review a sentence of death. The Washington Supreme Court has held that the language of RCW 10.95.100 "is imperative and creates a duty" and that the statutory review of a death sentence must be undertaken by the court. *State v.*

*Dodd*, 120 Wash.2d 1, 14–15, 838 P.2d 86, 92 (1992) ("[A] defendant may, consistent with RCW 10.95, waive his right of general review but may not waive statutory sentence review." *Id.*, 120 Wash.2d at 20, 838 P.2d at 95). RCW 10.95.130 provides that such review "shall be in addition to any appeal. The sentence review and an appeal shall be consolidated for consideration." Several questions must be determined during the statutory review, including "whether the sentence of death was brought about through passion or prejudice." RCW 10.95.130(2)(c). RCW 10.95.140 provides that if the court "makes an affirmative determination" as to that question, the court "shall invalidate the sentence of death and remand the case to the trial court for resentencing in accordance with RCW 10.95.090 . . . ."

The Washington Supreme Court did not conduct a statutory review of Rupe's sentence at the time of his appeal of the first sentencing. *Rupe I*, 101 Wash.2d at 697, 683 P.2d at 591 ("We reject defendant's challenges to the death penalty statute, but do not reach the issue of statutory review. . . .").[34] Petitioner argues that the state's failure to follow its own procedures by conducting the statutory review during *Rupe I* violated his federal due process rights.

 Federal due process rights may be implicated by a state's failure to follow state procedural law. *Hicks v. Oklahoma*, 447 U.S. 343, 346, 100 S.Ct. 2227, 2229, 65 L.Ed.2d 175 (1980). However, this Court need not reach the issue whether the Washington Supreme Court violated state law by failing to conduct the statutory review because petitioner received all the process that would have been due to him had his sentence been invalidated based on such review.

Petitioner's arguments that his federal constitutional rights were violated by this failure is based on his assumption that a

---

**33.** Petitioner raised this claim for the first time in his motion for reconsideration from the state court's denial of his personal restraint petition. *State v. Rupe*, Nos. 59408–2 and 59557–7, Amended Motion for Reconsideration to the Court's Order Denying Appeal, Nov. 30, 1992; 27 REC 13009. The Washington Supreme Court denied the motion in a single-line order. *State v. Rupe*, Nos. 59408–2 and 59557–7 (Wash. Dec.

21, 1992), Order Denying Motion for Reconsideration; 27 REC 13033.

**34.** The state court first conducted a statutory review under RCW 10.95.100 in *Rupe II* after the retrial of the penalty phase. *State v. Rupe*, 108 Wash.2d 734, 765–71, 743 P.2d 210 (1987).

remand after invalidation by statutory review demands an automatic sentence of life imprisonment without parole in all cases. However, this reading of the statute ignores the language of RCW 10.95.090:

> If any sentence of death imposed pursuant to this chapter is . . . held to be invalid after all avenues of appeal have been exhausted by the parties to the action, or if the death penalty established by this chapter is held to be invalid by a final judgment of a court which is binding on all courts in the state, the sentence . . . shall be life imprisonment. . . .

RCW 10.95.090. In the state court's denial of Rupe's personal restraint petition, the Washington Supreme Court analyzed this statutory language and held:

> The only reasonable construction of the statute is that it applies only to situations in which there are truly no further proceedings legally available or contemplated. An example would be when a death penalty is reversed for insufficient evidence. Where the trial court has committed an evidentiary or procedural error which in any other case would permit a remand for a new trial, however, the decision on appeal is not "final" for purposes of the statute.

Order of Nov. 3, 1992, slip op. at 8; 27 REC 12978. A defendant whose sentence is not invalidated by a "final judgment" is subject to further special sentencing proceedings. RCW 10.95.050(4).

Even if the Washington Supreme Court had conducted the statutory review and invalidated Rupe's death sentence based on improper admission of evidence of Rupe's gun collection, as petitioner claims should have happened, the outcome would not have changed. Admission by the trial court of the gun evidence was "evidentiary . . . error

which . . . would permit a remand for a new trial. . . ." *See* Order of Nov. 3, 1993, slip op. at 8. A *Rupe I* opinion that included a statutory review analysis thus would not have been a "final judgment" for purposes of RCW 10.95.090, and the result of any such review would have been a second penalty phase trial under RCW 10.95.050(4). *Id.* Petitioner thus cannot demonstrate any prejudice or fundamental unfairness stemming from the lack of such review.[35]

█ Petitioner also argues that because the Washington Supreme Court declined to conduct the mandatory review, and because this failure was due to his prevailing on arguments he raised on direct appeal, he would have been better off not filing any appeal. He argues that if he had not appealed his death sentence directly, the Washington Supreme Court would have reviewed his first death sentence under the mandatory review procedure *only.* *See Dodd,* 120 Wash.2d at 14–15, 838 P.2d 86. Rupe reasons that the Court then would have reached the passion and prejudice question, would have invalidated the sentence, and would have remanded for sentencing for life without parole, as Rupe's reading of RCW 10.95.090 demands. Petitioner argues that the failure to conduct the statutory review thus chilled his federal constitutional right to appeal directly his death sentence. *United States v. Jackson,* 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968); *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), *overruled on other grounds, Alabama v. Smith,* 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989).

The constitutionality of the Washington Supreme Court's apparent practice of delaying statutory sentencing reviews where a petitioner succeeds on direct appeal appears to be a matter of first impression.[36] But

---

**35.** The state's failure to conduct the statutory review is subject to the traditional harmless-error standard because such failure in the appellate review process is not a "structural defect in the constitution of the trial mechanism." *Arizona v. Fulminante,* 499 U.S. 279, 309, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302, 331 (1991).

**36.** In *State v. Bartholomew,* 98 Wash.2d 173, 654 P.2d 1170 (1982), *vacated,* 463 U.S. 1203, 103 S.Ct. 3530, 77 L.Ed.2d 1383 (1983), the Wash-

ington Supreme Court similarly failed to conduct the mandatory review. It invalidated the defendant's death sentence based on factors raised in his direct appeal, and remanded for sentencing of life imprisonment without parole for reasons unrelated to the mandatory review procedures. *Id.,* 98 Wash.2d at 177, 654 P.2d 1170. In *State v. Furman,* 122 Wash.2d 440, 858 P.2d 1092 (1993), the court similarly failed to conduct the mandatory review, but invalidated the death sen-

Rupe's argument again rests upon the erroneous assumption that invalidation of a sentence due to the statutory review process *automatically* results in imposition of a sentence of life imprisonment without parole. Even if statutory review had yielded an invalidation due to prejudice based on admission of the gun evidence, the outcome in this case would have been the same as the outcome due to invalidation on direct appeal: remand due to errors that could be cured by further proceedings. Such proceedings were provided to petitioner. Thus, petitioner's claims under 5.22 and S5.22 must be denied.

## V. CONCLUSION

The Court GRANTS Mitchell Edward Rupe's petition for writ of habeas corpus as to Claim 5.3. By separate Order issued concurrently, the Court also grants petitioner habeas relief on Claim S.5.23. The Court DENIES the remainder of Rupe's habeas claims.

IT IS SO ORDERED.

tence based on its holding that the death penalty cannot be imposed for crimes committed by juveniles. *Furman*, 122 Wash.2d at 455, 858 P.2d 1092.

Since both of these cases resulted in imposition of a life sentence without parole rather than a second sentencing proceeding, the issue raised by petitioner did not arise in the other cases.